IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JOY GLOBAL, INC. f/k/a Harnischfeger Industries, Inc., | ) ) ) | |
| | ) | |
| Debtor. | ) ) | |
| JOY GLOBAL, INC., f/k/a Harnischfeger Industries, Inc., | ) ) ) | Civil Action No. 01-39-KAJ |
| | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| WISCONSIN DEPARTMENT OF WORKFORCE DEVELOPMENT, | ) ) ) | |
| Defendant. | ) ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
ON ERISA PREEMPTION**

Bruce Grohsgal, Esq., Scotta E. McFarland, Esq., Pachulski, Stang, Ziehl, Young, Jones & Weintraub, 919 North Market Street, Suite 1600, Wilmington, Delaware 19801; Counsel for Plaintiff.

    Of Counsel: David F. Loeffler, Esq., Krukowski & Costello, S.C., 7111 West Edgerton Avenue, Milwaukee, Wisconsin 53220.

Stuart B. Drowos, Esq., Delaware Department of Justice, 820 North French Street, 8th Floor, Wilmington, Delaware 19801; Counsel for Defendant.

    Of Counsel: Richard B. Moriarty, Esq., John R. Sweeney, Esq., Wisconsin Department of Justice, P.O. Box 7857, Madison, Wisconsin 53707.

July 26, 2006
Wilmington, Delaware



**JORDAN, District Judge**

I.   **INTRODUCTION**

This is a bankruptcy case.  The debtor, Joy Global, Inc. ("Joy Global"), is the successor of Harnischfeger Industries, Inc. ("Harnischfeger"), by virtue of proceedings that followed petitions for relief filed by Harnischfeger and its subsidiaries under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330.  Beloit Corporation ("Beloit") was one of those subsidiaries.[1]  The case before me now arises from proofs of claim filed by the Wisconsin Department of Workforce Development ("DWD") against Harnischfeger and Beloit on behalf of 378 former employees of Beloit, seeking to recover severance pay allegedly owed to those employees under Wisconsin law.[2] (Uncontested Facts, Docket Item ["D.I."] 213 at ¶ 5.)

DWD's claims were withdrawn from the Bankruptcy Court to this court, pursuant to 28 U.S.C. § 157(d), and, on March 27, 2002, the Honorable Roderick R. McKelvie[3] entered judgment in favor of Harnischfeger and Beloit (D.I. 111), based on an earlier

---

[1] "Prior to the debtors' Chapter 11 filing, Harnischfeger was a holding company that owned 80% of the stock of Beloit." *In re Harnischfeger Industries, Inc.*, 270 B.R. 188, 190 (D. Del. 2001), *vacated in part and remanded*, 80 Fed. Appx. 286 (3d. Cir. Jul. 2, 2003) (opinion in court records at D.I. 118).

[2] This proceeding began when DWD allegedly requested that the Wisconsin Attorney General prosecute Harnischfeger and Beloit for failure to pay severance benefits to certain employees.  (D.I. 2, Ex. B at 10.)  Harnischfeger and Beloit then sued DWD, as well as officials from the Wisconsin Attorney General's Office and the Wisconsin Labor Standards Division, requesting injunctive relief, claiming that prosecution was precluded under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., and Article VI, Section 2 of the United States Constitution.  (D.I. 2, Ex. B at 10-13.)

[3] This case was originally assigned to Judge McKelvie.  (D.I. 4.)  He retired from the court in 2002.  On April 28, 2004, after the case was remanded by the Court of Appeals, the case was reassigned to me.  (D.I. 120.)

summary judgment opinion, in which he concluded that DWD's claims failed under Wisconsin contract law. *Harnischfeger Indus., Inc. v. Wis. Dep't of Workforce Dev. (In re Harnischfeger Indus., Inc.)*, 270 B.R. 188, 198-203 (D. Del. 2001). Judge McKelvie also considered whether DWD's claims were preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., but he concluded that there was insufficient evidence in the record to decide the issue. *Harnischfeger*, 270 B.R. at 195-98, 203.

On appeal, the United States Court of Appeals for the Third Circuit concluded that the threshold issue of ERISA preemption should have been resolved prior to the Wisconsin state law issue. (D.I. 118 at 5-6.) The Court explained that the preemption issue turns on whether Beloit's severance policy, which provided the basis for DWD's claims, was an "employee benefit plan" under ERISA. (*Id.* at 6.) The court went on to note that whether there was such a plan is a question of fact, "to be answered in light of all surrounding facts and circumstances ... ." (*Id.* (citations omitted).) Accordingly, the Third Circuit vacated the judgment in part[4] and remanded for a decision on whether the severance policy was an ERISA plan. (*Id.* at 6-7; D.I. 117.)

Later, on April 16, 2004, the Bankruptcy Court approved a settlement agreement between DWD and Beloit, according to which DWD reserved all claims against Joy Global, the successor to Harnischfeger. (Uncontested Facts, D.I. 213 at ¶ 10.) Thus, the only claim before me now is that made by DWD against Joy Global.

---

[4]While the Court of Appeals vacated the judgment and remanded for a decision on preemption, it affirmed the administrative expense allocation of DWD's claims, as well as the decision to allow the debtors to withdraw deemed admissions pursuant to Federal Rule of Civil Procedure 36(b). (D.I. 118 at 6-7.)

I conducted a two-day bench trial on the issue of ERISA preemption, starting on October 31, 2005. The following are my post-trial findings of fact and conclusions of law, issued pursuant to Federal Rule of Civil Procedure 52(a). For the reasons set forth below, I conclude that Beloit's severance policy was not an "employee benefit plan" under ERISA and, therefore, that DWD's claim is not preempted by ERISA.

## II. FINDINGS OF FACT[5]

### A. *Beloit's Severance Policy*

1. DWD bases its claim on a severance policy set forth by Beloit in a document dated December 10, 1996. *See Harnischfeger*, 270 B.R. at 193-94 (discussing DWD's claim that debtors were liable "under the 1996 severance plan"). That policy (the "1996 Policy" or the "Policy") reads in its entirety:

> All U.S. non-union employees, who do not have recall rights, will be entitled to the following Severance benefits:
>
> 1. Severance pay in the amount of one week's pay for each full year of service, with a minimum of four weeks and a maximum of twenty six weeks.
>
> 2. Unused vacation for the current year and any accrued vacation required by law.
>
> 3. Continuation of group medical coverage through the end of the month of the severance pay, provided the employee continues the appropriate contribution. This extended coverage will be counted as coverage time under COBRA requirements.

---

[5]Throughout these Findings of Fact and Conclusions of Law, I may have adopted without attribution language suggested by one side or the other in this dispute. In all such instances, the finding or conclusion in question has become my own, based upon my review of the evidence and the law. To the extent that any of my findings of fact may be considered conclusions of law or vice versa, they are to be considered as such.

> Any exceptions to this policy requires [sic] the approval of the Corporate Vice President of Human Resources.

(Plaintiff's Trial Exhibit ["PTX"] 2.)

2. The 1996 Policy was drafted as an amendment to an earlier policy from 1991. (Kraus,[6] Transcript ["Tr."] of trial at A15:16-19.) Under the 1991 policy, anyone employed by Beloit for at least one year "who [was] involuntarily terminated for reasons other than misconduct, retirement, or death," would receive a severance payment "based upon length of continuous service computed from the date of the employee's last hiring" and a designated multiple of either a "month's salary" or a "week's salary." (PTX 1 at ¶ B.6.) The maximum severance payment under the 1991 policy was either two month's salary or three weeks salary, depending on whether one was an exempt or non-exempt employee. (*Id.*)

3. The 1996 Policy was adopted in anticipation of "pending changes in the work force," i.e., layoffs, and was meant to provide enhanced severance payments to employees. (Kraus, Tr. at A15:20-A16:23.) Under the 1996 Policy, both the maximum and minimum payments were increased so that "every employee that was involuntarily terminated would receive one week's pay for each [year][7] of service up to a maximum of 26 weeks ... [with] a minimum, regardless of service, of four weeks pay." (Kraus, Tr. at A16:17-21.)

---

[6] Joseph Kraus was Corporate Vice President of Human Resources at Beloit from November 1995 to May 1997. (Tr. at A13:12-24.)

[7] Mr. Kraus stated the benefit as a week of pay for each week of service, but that was apparently no more than a slip of the tongue, since both logic and the language of the 1996 Policy demonstrate that the point was to award weeks of pay in correspondence to years of service. (*See* PTX 2.)

4

4.      Under the 1996 Policy, as under the earlier policy, permanent termination of employment for reasons other than misconduct or an employee's decision to quit or retire was a condition for receiving a severance payment. (Uncontested Facts, D.I. 213 at ¶ 16.) The Policy did not require employees to execute non-compete or confidentiality agreements in order to receive severance benefits. (*Id.* at ¶¶ 30-31.)

B.      *Procedures for Receiving Severance Benefits Under the Policy*

5.      As Joy Global concedes, there is nothing in the text of the Policy about what, if any, procedure is to be followed when severance is to be paid. (Tr. at A9:17-23.) Therefore, the evidence for any such procedures must be found in the testimony of former Beloit executives.

6.      According to those witnesses, the procedures for determining the amount of severance benefits under the 1996 Policy were "very similar or the same" as under the previous 1991 policy. (Monahan,[8] Tr. at A37:22-A38:2.) Under both policies, management would determine which employees were going to be laid off (Monahan, Tr. at A27:22-A28:12, A28:21-A29:21; Winkleman,[9] Tr. at A54:19-A55:11; Miller,[10] Tr. at B8:10-B9:6), and then severance benefits were calculated according to "the number of

---

[8]Timothy J. Monahan was a Beloit employee from September 1987 to August 1999. (Tr. at A24:14-18.) He held several positions at Beloit, including Vice President of Human Resources. (Tr. at A28:15-19.)

[9]Dennis Winkleman was a Beloit employee from November 1997 to early 2000 and held the position of Senior Vice President of Human Resources. (Tr. at A53:14-20.)

[10]Cathi Miller was a Beloit employee from January 1998 to August 2000 and held the positions of Vice President of Human Resources and Acting Executive VP of Human Resources. (Tr. at B4:3-11.)

years times the salary" (Monahan, Tr. at A29:4-7; *see also* Miller, Tr. at B36:4-8). The affected employee would receive an explanation of those severance benefits. (*See* Monahan, Tr. at A33:24-A34:5 ("We would say based on your years of service, this is what benefit you would receive in the process."); Miller, Tr. at B9:6-20.) Rather than being paid in a lump sum, the severance benefits were "paid out just like you would get your normal pay," every two weeks or bimonthly, as if the laid off employee were still on the job. (Tr. at B10:7-18.)

    C.    *Enhanced Severance Benefits*

7.    Certain employees received a severance benefit greater than the amount provided by the written Policy. For example, the severance benefit was enhanced for certain employees that were close to retirement, in order to provide a "bridge" to their retirement date and the start of retirement benefits. (Monahan, Tr. at A35:10-21, A38:3-8; Miller, Tr. at B6:15-24.) A signed severance agreement was executed in those situations. (Monahan, Tr. at A35:20-23.)

8.    Certain employees, who took leaves of absence or who left Beloit voluntarily and returned, received severance benefits as if their service had been continuous. (Miller, Tr. at B7:11-B8:5.)

9.    Some employees in protected classes who might claim that they were discriminated against because of age or minority status received enhanced severance payments in exchange for releases. (Winkleman, Tr. at A55:16-20; Miller, Tr. at B7:4-10.)

10.    Severance benefits were also enhanced for employees with "unique or special skills" so that such employees would not leave Beloit during the downsizing.

(Winkleman, Tr. at A55:24-A56:2; Miller, Tr. at B6:25-B7:3.) Employees with proprietary knowledge received an enhanced severance in exchange for a confidentiality agreement with Beloit. (Winkleman, Tr. at A56:3-5; Miller, Tr. at B6:25-B7:3.) Other employees received an enhanced severance in exchange for non-compete agreements. (Winkleman, Tr. at A56:5-10; Miller, Tr. at B6:25-B7:3.)

11.   One particular employee, Sandra Cook,[11] received enhanced severance benefits corresponding to six months salary according to a "Settlement Agreement & Release" executed in 1999 (PTX 10; Winkleman, Tr. at A99:11-19; Cook, Tr. at B110:6-9), even though she worked at Beloit for less than two years (Winkleman, Tr. at A56:21-A57:2).

12.   When enhanced severance benefits were granted, "there would be a pretty lengthy severance agreement" signed by both parties. (Miller, Tr. at B9:21-B10:1.)

   D.   *Treatment of the Policy by Employees of Beloit and Joy Global*

13.   At no time through November 1, 2005, had Beloit, or Joy Global on behalf of Beloit, ever filed with the United States Department of Labor, the Internal Revenue Service, or any other federal agency, any annual report ("Form 5500 report") with respect to the Policy, as required under ERISA. (Uncontested Facts, D.I. 213 at ¶ 24; Plaintiff's Opening Statement, Tr. at A6:23-A7:1.)

---

[11] Cook was a Beloit employee from April 1998 to May 1999 and held the positions of Director of Compensation and Benefits and Vice President of Corporate Human Resources. (Tr. at B71:11-22.)

7

14.     At no time through November 1, 2005, had Beloit, or Joy Global on behalf of Beloit, ever distributed to any Beloit employee eligible for severance benefits a summary plan description, as is required for ERISA plans, or a summary annual report regarding the Policy. (*Id.* at ¶¶ 27-28; Plaintiff's Opening Statement, Tr. at A7:7-9.)

15.     Beloit executives who testified at the trial either did not know whether forms had been filed with the Department of Labor or Internal Revenue Service concerning Beloit's 1991 or 1996 severance policies or they knew that the forms were not filed. (Kraus, Tr. at A18:8-11, A19:21-A20:3, A20:10-16; Monahan, Tr. at A36:25-A37:4, A39:14-A40:2; Winkleman, Tr. at A58:6-10, A60:15-17; Miller, Tr. at B21:22-B22:2; Cook, Tr. at B138:3-16.)

16.     Monahan testified that he was "never aware" that the Policy was considered an ERISA plan. (Monahan, Tr. at A46:20-A47:3, A48:23-A49:12.)

17.     Winkleman testified that he believed that the Policy was governed by ERISA, but that he gave no thought to whether the necessary forms were filed. (Winkleman, Tr. at A88:10-A89:2.)

18.     After the Harnischfeger and Beloit bankruptcy filings, outside legal counsel opined that the Policy was an ERISA plan. (Miller, Tr. at B38:19-B40:5, B48:13-B50:2.)

19.     That after-the-fact conclusion was, however, at odds with the position taken by in-house legal counsel for Joy Global, Kim Robert Kodousek,[12] who told the

---

[12]Kodousek was, at the time of trial, the Associate General Counsel and Assistant Secretary for Joy Global. (Tr. at B51:24-B52:6.) When he was contacted by the U.S. Department of Labor in early 2000, he was employed by Harnischfeger. (*Id.* at B52:7-9.)

office of the U.S. Department of Labor in Chicago (the "DOL") in early 2000 that neither Harnischfeger nor Beloit had a severance benefit plan covered by ERISA. (Defendant's Trial Exhibit ["DTX"] 291.) A DOL representative contacted Kodousek so that the DOL could respond to a Congressman's inquiry about whether the denial of severance benefits to Beloit employees was a violation of ERISA. (*Id.*) According to a letter written by the DOL's Regional Director and dated March 9, 2001, Kodousek stated that the severance benefits "did not relate to an ERISA covered plan sponsored by either Harnischfeger or Beloit." (*Id.*) While at one point during trial Kodousek denied that he discussed the 1996 Policy with anyone from the DOL (Kodousek, Tr. at B53:24-B54:2, B62:8-15), that testimony was not credible. Rather, it is clear from the whole of his testimony that either he did not recall whether he discussed the Policy (*id.* at B53:6-11, B58:9-19, B62:21-22 ("I don't remember the call. I don't remember the substance of the call but I don't believe I did so [i.e., stated that the Policy was not an ERISA plan], no.")), or he was taking shelter in a claim of forgetfulness to avoid acknowledging a position that is now at odds with his employer's interests. The weight of evidence strongly suggests that Kodousek did discuss the 1996 Policy with a DOL representative during a DOL investigation and that Kodousek took the position reflected in the March 9, 2001 letter from DOL's Regional Director (DTX 291).[13]

---

[13]Whether DTX 291 should have been admitted and considered at all was a matter of intense dispute during the parties' preparations for trial. As noted, that exhibit is the March 9, 2001 letter of DOL Regional Director Kenneth M. Bazar to Joy Global's outside benefits counsel, Ms. Vicki Hood. It explains that DOL undertook an inquiry at a Congressman's request into whether Beloit's treatment of fired employees was at odds with ERISA requirements. (DTX 291 at 1.) That inquiry evidently ended when Mr. Kodousek, in-house counsel for Beloit's parent, Harnischfeger, asserted to DOL that, neither Harnischfeger nor Beloit has a severance benefit plan. Mr. Kodousek

9

> further advised ... that the benefits offered to the employees of Harnischfeger and Beloit resulted from bankruptcy negotiations related to wages, vacation pay, and severance. He explained that these benefits were negotiated as part of the bankruptcy proceedings and did not relate to an ERISA covered plan sponsored by either Harnischfeger or Beloit.

(DTX 291.) Thus, taken at face value, the exhibit shows Joy Global's predecessor-in-interest seeking to avoid the consequences of a federal investigation by declaring a position diametrically opposed to the position Joy Global has taken in this case.

Naturally, Joy Global sought to avoid appearing so obviously inconsistent in its legal positions. It argued that DTX 291 is of no consequence because it is inadmissible as hearsay piled on hearsay. (*See, e.g.*, D.I. 191 at 3.) The first level of hearsay is the letter as a substitute for sworn and cross-examined testimony of its author, Mr. Bazar. A second possible level of hearsay exists, according to Joy Global, because of the possibility that Mr. Kodousek did not speak to Mr. Bazar at all but to some other DOL representative who in turn relayed the information to Mr. Bazar. The third level of hearsay is the statement of Mr. Bazar as to what Mr. Kodousek said.

Further complicating the situation is the fact that Joy Global actively, and apparently successfully, sought to prevent DWD from taking the deposition of Mr. Bazar. On May 6, 2005, DWD sent a six-and-a-half-page, single-spaced letter to DOL (D.I. 189 at Ex. E), pursuant to 29 C.F.R. §§ 2.20 et seq., seeking an opportunity to depose Mr. Bazar. The cited section from the Code of Federal Regulations is a regulation of the type named for the Supreme Court's decision in *United States, ex rel. v. Touhy*, 340 U.S. 462 (1951). *Touhy* regulations seek to control how federal agencies respond to subpoenas. *See, e.g.*, 29 C.F.R. § 2.20 ("This subpart sets forth the procedures to be followed whenever a subpoena, order, or other demand ... of a court or other authority, in connection with a proceeding to which the U.S. Department of Labor is not a party, is issued for the production or disclosure of ... information or material acquired by any person while such person was an employee of the Department ... ."). Soon thereafter, on May 23, 2005, Joy Global, through counsel, wrote its own six-and-a-half, single-spaced letter to DOL, urging that DOL not make anyone available for deposition or appearance at trial. (D.I. 189, Ex. F. at 3.)

DWD argued that DTX 291 is admissible under Federal Rule of Evidence 803(8)(C) because it is a report of a public agency of factual findings following an investigation. Joy Global did not dispute that DTX 291 is a "report" of a "public office resulting from an investigation" undertaken by DOL. (D.I. 191 at 2; 9/25/05 Tr. at 18:7-11.) However, it contended that the exhibit fails the test of admissibility under 803(8)(C) because the circumstances surrounding the letter indicate a lack of trustworthiness. (*Id.* at 2-3.)

After reviewing the parties' written submissions on the admissibility of DTX 291 and hearing them argue the question, I concluded at the pretrial conference that I would admit the document. (9/25/05 Tr. at 23:12-24.) I determined that the objection on the first level of hearsay, that a letter rather than a witness was being adduced, was overcome by the hearsay exception set forth in Rule 803(8)(C) and that, moreover, Joy

---

Global could not fairly complain about hearsay on that level since it had actively sought to prevent any witness from being available. (*See id.* at 20:2-10.) The 803(8)(C) exception also answered the objection to the second level of hearsay, the question of "how many sets of [DOL] ears the alleged Kodousek statements passed [through] before the allegation was encapsulated in the letter ... ." (D.I. 191 at 3.) Rule 803(8)(C) clearly contemplates that a record or report tendered under the rule will be the work of an "office" or an "agency," i.e., that it may be, indeed is likely to be, a collective effort rather than the work of any one individual, so the protestation that multiple people may have contributed to the information in the report is no bar to admissibility. As to the third level of hearsay, that Bazar was reporting Kodousek's out-of-court statements, the question is really whether Kodousek was authorized to speak for Harnischfeger and Beloit. If he was, his statements are admissions and therefore not hearsay at all, under Federal Rule of Evidence 801(d)(2)(C) or (D). There does not appear to be any dispute that Kodousek represented and was authorized to speak for both Harnischfeger and Beloit. There is ample authority for the proposition that an attorney's statements may bind the party whom the attorney represents. *See, e.g., In re Bay Area Material Handling, Inc.*, 76 F.3d 384, 1996 WL 29262 at *3 (9th Cir.1996) (unpublished opinion) (attorney's statement not hearsay "because it was both an authorized statement by a representative and a vicarious admission by an agent"); *United States v. Martin*, 773 F.2d 579, 583 (4th Cir. 1985) (attorney's statements to IRS admissible against client under Rule 80(d)(2)(D)); *United States v. Tuschman*, 405 F.2d 688, 690 (6th Cir. 1969) (representations made by attorney acting for client should have been admitted into evidence). Kodousek's representations are binding, as he was responding on behalf of his employer-client to an investigative inquiry from a government agency.

    Finally, Joy Global's assertion that the letter lacks indicia of trustworthiness is inaccurate. The surrounding circumstances indicate that DOL's report of its investigation, including its report that it concluded the investigation based upon Beloit's representation that the 1996 Policy was not an ERISA plan, is trustworthy. That conclusion is consistent with, first, the other evidence in the case, which indicates that Beloit never behaved as if the Policy were governed by ERISA, second, the specificity of the information contained in the letter, which details the conversation as well as naming the individual, Mr. Kodousek, with whom DOL had the conversation and whom it appears no one at DOL would have had reason to know but for the recited conversation, and, third, DOL's interest in responding appropriately to a Congressional inquiry, which reason suggests would be taken seriously and would not be treated as an occasion for DOL employees to fabricate evidence.

    When all was said done in the case, DTX 291 was not as significant as the parties believed it would be, since Joy Global failed to carry its burden of proof even without that exhibit on the scales. But it was admitted and its presence in the record further supports the conclusion I have reached.

### III. CONCLUSIONS OF LAW

1. Jurisdiction over the subject matter of this action is proper under 28 U.S.C. § 1334.

2. ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in § 1003(a) of this title and not exempt under § 1003(b) of this title." 29 U.S.C. § 1144(a). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 96-97 (1983). As the Third Circuit explained during its earlier review of this case, the issue here is whether the 1996 Policy is an employee benefit plan. (D.I. 118 at 5-6.)

3. "Whether a plan exists within the meaning of ERISA is 'a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person.'" *Deibler v. United Food & Commercial Workers' Local Union 23*, 973 F.2d 206, 209 (3d Cir. 1992) (quoting *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1082 (1st Cir. 1990)). A plan under ERISA "is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Id.* (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982)).

4. "[S]everance benefits do not implicate ERISA unless they require the establishment and maintenance of a separate and ongoing administrative scheme." *Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, 1538 (3d Cir. 1992) (citing *Fort Halifax*

12

*Packing Co. v. Coyne*, 482 U.S. 1 (1987)). Indeed, "[t]o do little more than write a check hardly constitutes the operation of a benefit plan." *Fort Halifax*, 482 U.S. at 12.

    5.    To support its claim of ERISA preemption, Joy Global bears the burden of proof as to whether the 1996 Policy was a plan under ERISA. *Plumbing Indus. Bd. v. E.W. Howell Co.*, 126 F.3d 61, 68 (2d Cir. 1997); *Kanne v. Conn. Gen. Life Ins. Co.*, 867 F.2d 489, 492 n.4 (9th Cir. 1988) ("Because [the] claim of ERISA preemption is a federal defense . . . the burden is on the [proponent of preemption] to prove the facts necessary to establish it.").

    6.    Joy Global has failed to show by a preponderance of the evidence that the 1996 Policy was an ERISA plan, as the concept of a "plan" is defined in *Deibler*, 973 F.2d at 209. I conclude, and DWD concedes, that the Policy and the surrounding circumstances sufficiently reveal the intended benefits, the class of beneficiaries, and the source of financing (*see* PX2; April 20, 2005 Hearing Transcript at 33:19-34:5), but Joy Global has failed to demonstrate the presence of procedures for awarding and receiving benefits.

    7.    The text of the Policy does not reveal any such procedures. (Finding of Fact ["FF"] ¶ 5; *see* PTX 2.) According to the testimony of Beloit executives, once it was determined that an employee was going to be laid off, the amount of severance benefit was calculated according to the simple formula set forth in the Policy, the employee was informed of the benefit, and the benefit was paid out in installments. (FF ¶ 6.) Those "procedures" involve little more than doing arithmetic and writing a check. The fact that payments were made in installments rather than as a lump sum does not,

13

in this case, transform the task into a set of procedures implicating ERISA. *See James v. Fleet/Norstar Fin. Group, Inc.*, 992 F.2d 463, 466-67 (2d Cir. 1993) (reaching that conclusion). Employees simply stayed on the payroll until the end of the severance benefit.

8. Joy Global asserts that the enhanced severance benefits given to specific employees demonstrates that there was discretion under the 1996 Policy and, therefore, that there were procedures for making decisions on enhanced severance. (D.I. 224 at Proposed Conclusion of Law ¶ 5.) The assertion is a non-sequitur. While decisions were made to enhance severance benefits in certain cases (FF ¶¶ 7-12), Joy Global has not shown that those decisions were made in the context of any procedure related to the 1996 Policy. The decisions were ad hoc and made pursuant to separate written agreements with individual employees. (FF ¶¶ 7, 9-12.)

9. For example, the decision that certain employees who took leaves of absence, or who left Beloit voluntarily and returned, would be treated as if their service had been continuous (FF ¶ 8) does not demonstrate a level of discretion that would transform the process into one that implicates ERISA. There were no guidelines or policies in place to indicate when and how any discretion might be exercised. There was no indication in the Policy that discretion would be exercised at all.

10. Because Joy Global has failed to demonstrate that the 1996 Policy included a set of procedures for receiving benefits, the 1996 Policy is not a plan under ERISA. Therefore, DWD's claim does not relate to an ERISA plan, and there is no ERISA preemption.

11.     That conclusion is consistent with the way Beloit and Joy Global apparently viewed the 1996 Policy. Whether or not any particular employee subjectively believed that the Policy was covered under ERISA, no one at Beloit acted as if the Policy was an ERISA plan. No one ever carried out the routine government filings or handled the basic paperwork associated with ERISA plans. (FF ¶¶ 13-15.) In addition, Joy Global's in-house counsel responded to a DOL inquiry by stating that the severance policy was not covered by ERISA. (FF ¶ 19.) While my conclusion that the Policy is not a plan stands independent of that admission, the admission nevertheless is consistent with Beloit's actions – or, as far as its failures to carry out ERISA filing and record-keeping, Beloit's inaction. Joy Global's current position that the Policy should be dealt with according to ERISA standards is simply inconsistent with the evidence.

## IV.     SUMMARY OF CONCLUSIONS

In summary, for the reasons expressed herein, the claim brought by the Wisconsin Department of Workforce Development in this case is not preempted by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. An appropriate order will follow.