## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

In Re:                                          :
                                                :
JOY GLOBAL, INC. f/k/a                          :
HARNISCHFEGER INDUSTRIES, INC.                  :
                                                :
                          Debtor.               :
                                                :   Civ. No. 01-039-LPS
_____          :
                                                :
JOY GLOBAL, INC. f/k/a                          :
HARNISCHFEGER INDUSTRIES, INC.                  :
                                                :
                          Plaintiff,            :
                                                :
          v.                                    :
                                                :
WISCONSIN DEPARTMENT OF                          :
WORKFORCE DEVELOPMENT,                           :
                                                :
                          Defendant.            :

## OPINION

Bruce Grohsgal, PACHULSKI, STANG, ZIEHL & JONES LLP, Wilmington, DE; Steven M.
Biskupic, John D. Finerty, Jr., and Charles J. Crueger, MICHAEL BEST & FRIEDLICH LLP,
Milwaukee, WI, Attorneys for Plaintiff.


Stuart B. Drowos, Deputy Attorney General, DELAWARE DEPARTMENT OF JUSTICE,
Wilmington, DE; J.B. Van Hollen, Attorney General and Richard Briles Moriarty and Charlotte
Gibson, Assistant Attorneys General, WISCONSIN DEPARTMENT OF JUSTICE, Madison,
WI, Attorneys for Defendant.


September 21, 2010
Wilmington, Delaware

**STARK, U.S. District Judge**

In this tort case stemming from a complex bankruptcy of long standing, the following

constitute the Court's post-trial findings of fact and conclusions of law on the remaining claim of

tortious interference.

## BACKGROUND

### I.    Procedural History

The lengthy background of this case was comprehensively set forth in the Court's

December 2007 opinion rejecting the plaintiff's fourth motion for summary judgment. *See In re*

*Joy Global*, 381 B.R. 603, 606-10 (D. Del. 2007).  The Court has since ruled on two more rounds

of summary judgment briefing and a motion to dismiss (D.I. 317; D.I. 511), as well as the

parties' motions in limine (D.I. 537).  The Court conducted a bench trial on March 1-3, 2010.

(D.I. 550-52, hereinafter "Tr.")  The parties submitted post-trial briefing, which was completed

on June 24, 2010 (D.I. 562).

### II.    Evidentiary Objections

The Court's factual findings, and the conclusions that follow from them, are based on the

Court's review of all of the evidence introduced by the parties.  The Court did not sustain any

evidentiary objections at trial and does not sustain any here either.  Instead, the Court hereby

finds that all evidentiary objections not previously ruled upon have been waived by the parties

due to their failure to brief such objections in their post-trial briefs.

The Court made clear on numerous occasions that if the parties wished to press any

objections to the admissibility of evidence, the parties were to brief such objections post-trial.

For example, at the conclusion of the trial, the Court stated: "[T]he briefing is going to cover all

legal issues that the party wants me to consider, including any objections that have been reserved at any point with respect to the evidence. . . . [The post-trial briefs are] to cover not only the legal argument on the elements of the tort and privilege or defenses that are raised but also any evidentiary objections that either side wishes to address." (Tr. at 530)  Likewise, during the trial, when DWD rested its case, the Court admitted all exhibits and deposition testimony, adding: "Everybody's objections, however, are preserved and not waived.  So it's without prejudice to, as we've talked about since the pretrial conference, everybody preserving the objections that have been stated and reevaluating them in light of what the ultimate testimony is and briefing them, if you choose to persist with any of the objections . . . in your post-trial briefing.  But the evidence is admitted." ((Tr. at 256) (emphasis added); *see also* D.I. 549 at 2 (providing, in post-trial written Order, schedule by which "the parties shall file briefing, containing legal argument, including on any evidentiary objections") (emphasis added); D.I. 540 at 9 (pre-trial conference))

Despite this direction, DWD, in its opening post-trial brief, provided merely one paragraph of authorities supporting unspecified "hearsay objections" to Joy Global's prior testimony excerpts and broadly referred the Court to "revised objections" filed prior to trial. (D.I. 555-2 at 30-31) (citing D.I. 535 & D.I. 535-1)  In its reply brief, DWD again cited to previous filings (six of them), where it purportedly "articulated and preserved" its objections. (D.I. 559 at 11)  This is not the procedure the Court directed the parties to follow if they wished to maintain their objections – a fact that must have been clear to the parties, given their statements to the Court as well as the Court's explicit rejection of DWD's request to submit a "chart" or "checklist" or other separate filing devoted solely to evidentiary objections.  (Tr. at 527-30; *see also* Tr. at 255 (Joy Global stating, "Your guidance at the pretrial conference was let

2

it come in subject to post-trial briefing on the evidence and the objection."); Tr. at 490 (DWD responding to Joy Global motion to admit evidence by stating, "We do have issues about the listing of certain of the exhibits. . . . <u>We'll take that up in post-trial briefing</u>, if that is okay.") (emphasis added); D.I. 556 (letter to Court from Joy Global referencing that "the Court admitted evidence into the record subject to objections, and it made clear that if a party wanted the Court to address an issue with respect to an exhibit and rule on an objection, the party should raise the issue in post-trial briefing")) There would have been no point to the Court's establishment of page limits on post-trial briefing (*see* Tr. at 528-31) had the Court intended for the parties simply to refer to lengthy prior or additional filings for argument on objections.

For its part, Joy Global devoted one footnote in its answering brief to responding to DWD's "unexplained objections" and later noted that it preserved objections at trial to certain testimony. (D.I. 557 at 19 n.2 & 26) This, too, was inadequate to maintain objections, which would have required (at least) specific identification of the objectionable evidence, articulation of the basis for the objection, and citation to authority supporting a good faith basis for the objection. At no point in the post-trial briefing did either DWD or Joy Global do what was required to maintain its evidentiary objections.

## III. <u>Factual Findings</u>

### A. <u>The Parties</u>

1. "Joy Global" refers to Joy Global, Inc.; (b) "Harnischfeger" or "HII" refers to Harnischfeger Industries, Inc. that, as a result of bankruptcy proceedings, emerged from Chapter 11 reorganization as Joy Global, Inc.; (c) "Beloit" refers to Beloit Corporation; and, (d) "DWD" refers to the Wisconsin Department of Workforce Development. (D.I. 554 Ex.1 (Joint

3

Undisputed Proposed Findings of Fact, hereinafter "UPFOF") ¶ 1)

2. The "Debtors" are Harnischfeger and its U.S. based subsidiaries, including Beloit.

**B.** **Key Individuals**

3. Ross Altman was a Senior Vice President of Beloit and the General Counsel and Secretary of Beloit from April 1999 until he left in 2001. (UPFOF ¶ 34)

4. James A. Chokey was the General Counsel and Secretary of Harnischfeger, and an Executive Vice President of Harnischfeger, throughout calendar years 1998 and 1999. (UPFOF ¶ 35)

5. Robert N. Dangremond was a Principal at Jay Alix & Associates, a consultant to the Debtors whose retention was approved by the bankruptcy court. At a July 8, 1999 meeting of the Harnischfeger Board, he was elected Senior Vice President and Chief Restructuring Officer of Harnischfeger, retroactive to June 16, 1999, and remained in that position until sometime in 2001. At an October 26, 1999 meeting of the Board of Directors of Beloit, Dangremond was also elected Senior Vice President and Chief Restructuring Officer of Beloit with authority to: (i) solicit bids for the sale of Beloit, either as a whole or in parts, and (ii) liquidate the assets of Beloit to the extent he was unsuccessful in soliciting bids for the sale of Beloit and its parts. (UPFOF ¶ 36) William R. Currer was employed by Jay Alix from the spring of 1999 through June of 2002. (Ex. 104 at 5-7) He worked under the direction of Dangremond and was assigned to Beloit. (Ex. 104 at 6, 19)

6. John Nils Hanson was Vice Chairman, President and Chief Executive Officer of Harnischfeger from May of 1999 to August of 2000. During the relevant time period, Mr. Hanson was also the Chairman of Beloit's Board of Directors and Chief Executive Officer of

Beloit.  (UPFOF ¶ 38)

7.      Kenneth A. Hiltz was a Principal at Jay Alix.  At a July 8, 1999 meeting of the

Harnischfeger Board, he was elected Senior Vice President and Chief Financial Officer of

Harnischfeger, retroactive to June 16, 1999, and remained in that position through the balance of

1999.  (UPFOF ¶ 39)

8.      Carol Ann Mohr was Manager of Employee Benefits at Harnischfeger from the

late 1980s until 2000 and Director of Employee Benefits at Harnischfeger during 2001.  (UPFOF

¶ 42)

9.      Mark Readinger was the President of Beloit from 1998 onward.  Prior to that,

from 1996 to 1998, he was President and Chief Operating Officer of Joy Mining Machinery,

another subsidiary of Harnischfeger.  Starting in 1997, Mr. Readinger also held the position of

Senior Vice President of Harnischfeger and continued to do so throughout the relevant time

period.  Following his tenure as President of Beloit, Mr. Readinger was, from 2001 to 2002, the

President and Chief Executive Officer of Armillaire Technologies, a company having no

relationship with Harnischfeger or any of its subsidiaries.  In 2002, Mr. Readinger assumed the

position of Executive Vice President of Joy Global Inc.  He was also the President and Chief

Operating Officer of P&H Mining Equipment, one of Joy Global's subsidiaries, and continued to

hold those positions at least through trial.  (UPFOF ¶ 43)

10.     Dennis Winkleman was Senior Vice President, Human Resources at Beloit from

1997 to February 2000.  When he was deposed in December 2008, he had been an Executive

Vice President at Joy Global since May 2000.  (UPFOF ¶ 45)

11.     Eric B. Fonstad was an Associate General Counsel and Assistant Secretary for

5

Harnischfeger during calendar years 1999 and 2000.  (UPFOF ¶ 46)

C.     **Events Leading to Beloit's Bankruptcy**

12.     Beloit was primarily a pulp and paper machine manufacturer and designer with employees in Wisconsin and elsewhere.  According to the annual reports Harnischfeger filed with the U.S. Securities and Exchange Commission, Beloit was "a leader in the design and manufacture of pulp and pap[er] machinery and related products used in the pulp and papermaking industrie[s]" and it had "major manufacturing facilities in t[en] countries and sales and service offices located throughout the world."  (UPFOF ¶ 2)

13.     Harnischfeger was a holding company with numerous subsidiaries and owned 80% of Beloit's stock.  According to Harnischfeger's annual SEC filings, Harnischfeger was a "holding company for subsidiaries involved in the worldwide manufacture [and] distribution of surface mining equipment (P&H Mining Equipment); undergrou[nd] mining equipment (Joy Mining Machinery); and pulp and papermaking machine[ry] (Beloit Corporation)."  (UPFOF ¶ 3)

14.     Mitsubishi Heavy Industries Inc. owned the remaining 20% of Beloit's stock.  (UPFOF ¶ 4)

15.     Shortly after Beloit was acquired by Harnischfeger, Beloit's salaried supervisors lost significant benefits that Beloit had provided them, including vacation time, retiree health benefits, and a savings program.  (Tr. at 166-69, 233)  To save costs, Harnischfeger had the two companies purchase health and life insurance together and merged their pension and 401(k) plans, obtaining "control over" those "joint plans."  (Ex. 112 at 3-4, 6, 8-9)[1]  The two companies

---

[1]Citations to "Ex." refer to the exhibits received into evidence at trial, on file with the Court.

distributed joint employee benefit statements. (Ex. 116 at 94-96)  By June 7, 1999,

Harnischfeger "and its subsidiaries" as well as their "business operations" were "highly

integrated" and were filing consolidated tax returns. (Ex. 145 ¶¶ 7, 21, 35)

16.     From 1986 to 2001, Harnischfeger "arranged for professional firms to provide

essential services to Beloit such as legal, tax and accounting services" and paid all fees and

expenses charged by those firms. (Ex. 147 ¶¶ 1-2)  Before the bankruptcy commenced,

Harnischfeger arranged for PriceWaterhouse Cooper ("PWC"), PriceWaterhouse Cooper

Securities ("PWCS") (a subsidiary of PWC), and Kirkland & Ellis LLP ("K&E") to provide

bankruptcy services for the Debtors, including Beloit. (Ex. 108-21 at 2-3; Ex. 108-22 at 2-3; Ex.

103 at 35-38; Ex. 4; Ex. 5; Ex. 111 at 7-11: Ex. 145 ¶¶ 46, 53, 54; Ex. 147 ¶¶ 1-2)

### D.     Beloit's 1991 and 1996 Severance Policies

17.     Beloit adopted a severance policy, effective January 1, 1991, under which any

exempt non-union employee employed by Beloit for at least a year "who [was] involuntarily

terminated for reasons other than misconduct, retirement, or death," would receive a severance

payment calculated "based upon length of continuous service computed from the date of the

employee's last hiring" and a designated multiple of either a "month's salary" or "week's salary."

Under the 1991 policy, the amount of the severance payment could be "exceeded upon the

approval of the Vice President and General Manager of the Division." (UPFOF ¶ 5)

18.     Beloit amended the 1991 policy on December 10, 1996. Effective December 10,

1996, a non-union employee without recall rights whose employment relationship with Beloit

was terminated through no fault of the employee or for reasons other than employee initiative,

such as retirement or quitting, would receive a severance payment.  The payment was based on a

7

formula that multiplied "one week's pay" times "each full year of service," with a "minimum of four weeks" severance pay and a "maximum of twenty-six weeks" of pay.  (UPFOF ¶ 6)

19.     By contrast with the 1996 policy, under the 1991 policy persons with one year of service but less than five years of service had received only two weeks of severance pay, and persons with less than one year of service received no severance pay.  (UPFOF ¶ 7)  Also, under the 1996 Policy, a person with more than 25 years of service received 26 weeks of severance pay, while under the 1991 policy severance payments for exempt employees were capped at two months' pay regardless of length of service.  (UPFOF ¶ 8)  Under both the 1991 policy and the 1996 policy, permanent termination of employment for reasons other than misconduct or employee initiative (such as a resignation or retirement) was a condition for eligibility for any severance payment.  (UPFOF ¶  9)

20.     The 1996 Beloit severance policy, in its entirety, reads:


## BELOIT C O R P O R A T I O N

December 10, 1996

### SEVERANCE POLICY

All U.S. non-union employees, who do not have recall rights, will be entitled to the following Severance benefits:

1.     Severance pay in the amount of one week's pay for each full year of service, with a minimum of four weeks and a maximum of twenty-six weeks.

2.     Unused vacation for the current year and any accrued vacation required by law.

3.     Continuation of group medical coverage through the end of the month

8

of the severance pay provided the employee continues the appropriate contribution. This extended coverage will be counted as coverage time under COBRA requirements.

Any exceptions to this policy require the approval of the Corporate Vice President of Human Resources.

21.     From December 10, 1996 to November 19, 1999, severance payments were made according to the eligibility criteria and the calculation schedule set forth in the 1996 Beloit Severance Policy, to all "exempt" employees, if they were terminated for reasons other than misconduct or employee initiative.  (UPFOF ¶ 11)

22.     The severance payments made under that 1996 policy, from December 10, 1996 to November 19, 1999, were not paid in a lump sum.  Rather, the total payment due each employee was amortized and then paid out, in weekly installments, on the former employee's regularly scheduled pay day until the total number of weeks of severance pay owed to that employee was exhausted.  (UPFOF ¶ 12)

23.     The terms of the 1996 policy also required Beloit to pay the unused amount of vacation pay for the current year, plus any accrued vacation pay to the extent required by law.  (UPFOF ¶ 13)

24.     From November 7, 1997 to February of 2000, the "Corporate Vice President of Human Resources" referred to in the 1996 Policy was Dennis Winkleman.  (UPFOF ¶ 14)

**E.     Beloit Declares Bankruptcy**

25.     By 1998, Beloit was a failing business operating in disarray: the biggest orders in production were each causing losses of tens of millions of dollars; supervisors could not account for budgets; and creditors were demanding payments for obligations that management did not

9

even know existed.  (Tr. at 271-75)  For all of 1998, Beloit lost $368.7 million.  (Ex. 62 at 101)

26.     To stay afloat, Beloit obtained a massive influx of cash from Harnischfeger,
which was its parent corporation and 80 percent owner.  (Tr. at 277; Ex. 62 at 93)  By June of
1999, Beloit owed Harnischfeger in excess of $750 million.  (Ex. 63 at 154)

27.     In an attempt to turn around the situation, Beloit CEO John Hanson hired Mark
Readinger to take over as Beloit's President and Chief Operating Officer.  (Tr. at 258, 262,
443-45)

28.     Readinger quickly assessed the Beloit situation as "completely broken," "out of
control," and in need of "major surgery."  (Tr. at 274)  Deciding that the only alternative was to
dramatically cut capacity, Readinger undertook what he later described as "the worst part of the
job:" closing facilities and laying off thousands of workers.  (Tr. at  276; *see also* Ex. 61 at 102)

29.     Readinger operated with independence.  (Tr. at 281)  Readinger did not need, nor
did he seek, the permission of Hanson or anyone else before making the layoff decisions.  (Tr. at
281)  According to James Chokey, who served as general counsel of Beloit and later
Harnischfeger, Beloit management historically operated with "a great deal of independence"
from Harnischfeger – partly as a matter of practice and partly as a legal requirement because
Mitsubishi Heavy Industries owned the 20 percent of Beloit that was not owned by
Harnischfeger.  (Tr. at 468-69)

30.     On May 7, 1999, Beloit's Board of Directors determined that it was in the "best
interests" of Beloit, its creditors, stockholders, and other interested parties for Beloit to file for
bankruptcy.  (Ex. 4 at 5)  Readinger, as a member of the Beloit Board, voted in favor of the
bankruptcy.  (Ex. 4 at 5; Tr. at 280)

31.     On June 7, 1999, Harnischfeger and its U.S. based subsidiaries, including Beloit, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware.  Those filings were consolidated into a jointly administered case which was assigned Case No. 99-2171 (PJW); the filing entities (*i.e.*, the Debtors) were not substantively consolidated.  (Ex. 62 at 103; UPFOF ¶ 15)

32.     Harnischfeger decided that Beloit would join it in filing for bankruptcy and planned extensively for those filings.  (Ex. 103 at 35-39; Ex. 145; Ex. 151; Ex. 153; Ex. 154; Ex. 155; Ex. 108 at 17, 43-44, 46-48; Exs. 108-19 to 108-22; Ex. 5)  Harnischfeger prepared detailed information to provide to Beloit employees and others.  (Ex. 153; Ex. 154; Tr. at 181-84)  Just before those filings, Readinger and Winkleman were told of Harnischfeger's decision (Ex. 114 at 64-65, 67; Tr. at 280, 392), informed of the plans, and instructed what to do with respect to communication planning (Ex. 114 at 129-31; Ex. 114-27; Ex. 114-28)  Beloit's separate bankruptcy petition was signed by a Harnischfeger officer (Ex. 146 at 4), an individual who later stated  he was "never" employed by Beloit (Ex. 108 at 9).

33.     Beloit remained in desperate need of cash.  Immediately after the filing of the bankruptcy case, Harnischfeger loaned Beloit an additional $115 million.  (Tr. at 447; Ex. 62 at 107-09)

34.     With the approval of the Bankruptcy Court, the Debtors retained bankruptcy counsel K&E (Civ. No. 99-2171, D.I. 10) and multiple consulting firms including PWC (D.I. 15), PWCS (D.I. 16), and Jay Alix (D.I. 497).

35.     David Eaton was a partner with K&E who had primary responsibility for the reorganization of the Debtors.  His responsibilities included managing the divestiture of Beloit

11

Corporation in four continents.  (UPFOF ¶ 16)

36.     On June 16, 1999, Harnischfeger arranged for Jay Alix to provide bankruptcy services for the Debtors.  (Ex. 6; Tr. at 447-48; Ex. 106 at 27-28; Ex. 108-25 at 2; Ex. 110 at 6; Ex. 147 ¶¶ 1-2)  Chokey signed the Jay Alix contract for Harnischfeger.  (Ex. 6 at 8)  The contract provided that Jay Alix employees would be considered "independent contractors" and would not be employees or agents of the Debtors.  (Ex. 56 at 4)  The contract also entitled Jay Alix to a contingent success fee dependent on whether, and when, Harnischfeger reorganized, without regard to whether Harnischfeger's subsidiaries reorganized.  (Ex. 6 at 3; Ex. 106 at 47-48)  No similar contract ever existed between Jay Alix and Beloit.  (Ex. 105 at 45-46)

37.     Harnischfeger's contract with Jay Alix called for it to elect Jay Alix's Dangremond and Hiltz as Harnischfeger officers.  (Ex. 6)  In July 1999, the Harnischfeger Board retroactively approved the Jay Alix contract and elected Dangremond and Hiltz to their respective Chief Restructuring Officer and Chief Financial Officer positions at Harnischfeger, effective as of June 16, 1999.  (Ex. 6)  These elections were publicized in early August 1999. (Ex. 105 at 42-43; Ex. 105-10)

38.     Dangremond and Hiltz each had Harnischfeger offices (Ex. 110 at 6-7; Tr. at 450) and were responsible to Harnischfeger, which insured them against officers' liability and indemnified them (Ex. 6 at 5).  Dangremond's "loyalties were to Harnischfeger," as were those of Hiltz.  (Ex. 105 at 46-47; Ex. 110 at 4-7, 9, 25-26)  Harnischfeger's Hanson testified that while Dangremond played a "key role" in the auction of Beloit assets, he was otherwise "far less important" than fellow Jay Alix employee Ken Hiltz.  (Tr. at 449)  Chokey said Dangremond was relegated to his home because of recent back surgery.  (Tr. at 473-74)

39.     On or about June 25, 1999, the U.S. Trustee in Case No 99-2171, with the approval of the Bankruptcy Court, appointed the Official Committee of Unsecured Creditors of Harnischfeger Industries, Inc. and its affiliated debtors (the "Committee").  (D.I. 134)  Cleary, Gottlieb, Stein & Hamilton, LLP ("Cleary") was retained as official counsel to the Committee, a retention approved by the Bankruptcy Court.  James L. Bromley was one of the attorneys at Cleary who represented the Committee.  (UPFOF ¶ 17)

40.     From the first day of the bankruptcy, the management of Beloit viewed the Committee "as our new bosses" (Tr. at 281), who now controlled the Beloit "purse strings" and were owed a fiduciary duty (Tr. at 281, 393, 470-71).  The unsecured creditors had a strong motivation to see that expenses were controlled.  (Tr. at 316; Ex. 102 at 63-64)  Thus, for example, when a particular contract could not be economically justified to the Committee, Readinger had the "unpleasant" task of informing the Beloit customer that the contract would not be honored.  (Tr. at 316)  That contract was one of many that Readinger was forced to breach or cancel during the bankruptcy because of the financial interests of the Committee in limiting expenses.  (Tr. at 315)

41.     The consultants working for Beloit and those retained by the Committee routinely exchanged information regarding Beloit's financial condition.  (Tr. at 394; Ex. 103-24 at 12; Ex. 111-6; Ex. 105-8)

42.     From July through September 1999, the Debtors negotiated with the Committee to allow a Key Employee Retention Plan ("KERP") covering certain top managers.  (Ex. 102 at 18-20; Ex. 103 at 41-43; Ex. 103-22 at 23-25; Ex. 103-23 at A-37 to A-38; Ex. 106 at 70-71, 80; Ex. 111 at 36-39; Ex. 159 at 2-18)  The Committee agreed.  Attorney Eaton obtained an expedited

13

Bankruptcy Court hearing, after which the Court approved the KERP.  (Ex. 160 at 15-18; Ex. 159 at 2-18; Ex. 103 at 42-43, 53-55; Ex. 103-16; Ex. 103-17; Ex. 103-18)  The Committee's approval was required for the KERP to be expanded or revised.  (Ex. 25; Ex. 103-19)

43.     On October 7, 1999, Dangremond participated in Harnischfeger Board meetings called to approve Harnischfeger's decision to sell Beloit.  (Ex. 10; Ex. 11)  Dangremond, then a Harnischfeger officer, was made Chair of a team to implement the decision.  (Ex. 11; Tr. at 348-51; Ex. 110 at 9-24)  On October 8, 1999, Harnischfeger, through Dangremond, issued a press release about selling Beloit.  (Ex. 105-14; Ex. 114-19)

**F.     Events Leading to the 1999 Amendments to Beloit's Severance Policies**

44.     Winkleman testified that, based on inquiries made to Beloit about its benefit programs, in September or early October 1999 he contacted K&E about the 1996 policy, suspecting that action regarding the 1996 policy was being considered.  (Tr. at 417-19; Ex. 118 at 38)  On October 5, 1999, Winkleman met with Jay Alix's Currer about "scenario analysis."  (Ex. 105-8 at 66)  On October 8, 1999, Winkleman spoke with K&E's Eaton about "employee benefit" issues.  (Ex. 103-24 at A-36)

45.     A PWCS document, prepared for an October 12, 1999 meeting with Committee representatives in advance of an October 15 Committee meeting, examined a divestiture scenario for Beloit.  The document estimated that, upon divestiture, Beloit's severance costs would range from a "low" of $15 million to a "high" of $35 million; further, it listed all severance costs under an "Administrative" heading.  (Ex. 13 at CG 00455)  A similar document examining a

liquidation scenario noted that "low" estimates for severance assumed "WARN Act"[2] payments and "high" estimates assumed payments made pursuant to the 1996 policy; this liquidation scenario also listed all severance costs under an "Administrative" heading.  (Ex. 14 at CG 01935) The PWCS analysis noted that under the WARN Act, the potential severance cost would be $30 million (instead of $70 million) during a liquidation and $15 million (instead of $35 million) during a divestiture.  (Ex. 15 at 17, 24)  Beloit was ultimately divested.  (Ex. 106 at 23)

46.     On October 12, 1999, Dangremond reviewed the PWCS presentation with Committee representatives.  (Ex. 105-8 at 32)  Hiltz and Eaton were also involved in these discussions.  (Ex. 105-8 at 21; Ex. 103-24 at A-30)  Meetings between representatives of the Committee and representatives of Jay Alix and K&E were the prime way in which the Debtors and the Committee communicated with one another; it was common through such interactions for the Committee to be informed of contentious or important topics of discussion in advance of formal Committee meetings.  (Ex. 103 at 71-72; Ex. 106 at 62-63; Ex. 111 at 31-32)

47.     For an hour and a half on October 13, 1999, Dangremond met with "senior Beloit staff to review severance plan" and Hiltz participated in a "[t]eleconference with Beloit and HII [Harnischfeger] sr. mgmt regarding severance policies."  (Ex. 105-8 at 69; Ex. 105-8 at 21)  That same day, Dangremond billed two hours for a conference call with "HII sr. mgmt." and for preparation of a memo; on October 14, Dangremond spent an hour reviewing a memo "from HII."  (Ex. 105-8 at 15)  Matthew Antinossi at K&E researched "severance pay as a result of bankruptcy" for over three hours on October 14, 1999.  (Ex. 103-24 at A-36)

---

[2]"Worker Adjustment and Retraining Notification" Act, codified at 29 U.S.C. §§ 2101-09.

48.     The severance issue was addressed at the October 15, 1999 meeting of the Committee. (Ex. 15 at 17, 24; Ex.16; Ex.18; Ex.102 at 12, 23) According to a PWCS presentation, severance was one of the "standard options" looked at in a Chapter 11 liquidation/divestiture case. (Ex. 111 at 19-20) The minutes of the meeting reflect that the Committee reviewed Beloit's analysis of the costs and benefits of liquidation and divestiture. (Ex. 16 at 1; *see also* Ex. 15 at 17, 24 (setting forth financial costs of severance); Ex. 102 at 12 (Bromley testimony on importance of severance costs)) The minutes further reflect that the Committee directed Beloit "to assess the magnitude of losses that might be triggered if contracts are breached, and to assess how to minimize such losses in a liquidation scenario." (Ex. 16 at 1) No witness present at the Committee meeting recalled any specific mention of the 1996 policy (Ex. 102 at 33-34; Ex. 104 at 12-13; Ex. 106 at 57) and the minutes do not refer to "severance" or the "1996 policy" (Ex. 16).

49.     The October 15 Committee meeting was the only Committee meeting Jay Alix's Currer attended, and only because he happened to be in New York; his assigned role at the meeting was just to "stand by." (Ex. 104 at 12-14) After the Committee meeting, Currer called Readinger to update him on it. Currer's billing entry does not mention "severance." (Ex. 105-8 at 70; Tr. at 373) Currer's general role regarding severance issues was limited to number-crunching and he was not involved with any potential changes to the 1996 policy. (Ex. 104 at 12-14, 18)

50.     On October 16, Dangremond called "Beloit sr mgt," and on October 17 he called "Beloit staff" – on both occasions about sale and liquidation issues. (Ex. 105-8 at 15) On October 18, Dangremond telephoned "Beloit staff" "to discuss severance plan." (Ex. 105-8 at

71) On October 19, Hiltz participated in a "conference call regarding Beloit severance policy" and "follow-up analysis review." (Ex. 105-8 at 25) Also on October 19, Dangremond gave Eaton a "status update." (Ex. 105-8 at 16) From October 21 to 26, Antinossi, an attorney at K&E, drafted severance policy changes and a cover memo. (Ex. 103-24 at A-37 to A-38) On October 25, Hiltz attended a lengthy "meeting regarding Beloit severance." (Ex. 105-8 at 27)

51.    In an August 2008 deposition, Readinger testified that, in October 1999, he had been told that the Committee wanted Beloit's 1996 severance policy changed, that "cash pay to employees who were being separated was not something that [the Committee] care[d] to do," and that the Committee was "very close to edicting that they're not going to pay any more severance other than the bare minimum mandatorily required by the WARN Act." (Ex. 114 at 41-42, 46-47; *see also* Tr. at 307) Readinger identified the person who told him these things as someone at the Dangremond or Hiltz level, most likely Dangremond, and definitely not William Currer. (Ex. 114 at 41-42) Later in his deposition, Readinger testified that he had "several" conversations with Dangremond in October 1999 about trying to convince the Committee to accept an alternative severance plan. (Ex. 114 at 87-88)

52.    At trial, Readinger confirmed his recollection that it was Dangremond, and not Currer, who told him the Committee wanted the 1996 severance policy changed. But Readinger also questioned his memory based on a combination of factors: (a) billing entries by Currer and by R. Timothy Stephenson at K&E for October 15, 1999, (b) the absence of a billing record showing a Dangremond contact with Readinger on that day, (c) a belief that Winkleman had no K&E contacts before Winkleman had been told what the Committee wanted, and (d) his recollection that a phone call was involved. (Tr. at 306-07, 312-14, 361-71) Readinger added,

17

however, that if Currer was the one he spoke to, Readinger would have nonetheless viewed

Currer as speaking for Dangremond.  (Tr. at 377-78)[3]

53.    Readinger was distressed by what he was told.  (Ex. 114 at 43)  It "was a tough

day, and I sat back in my chair and said, you know, my God, this is wrong," by which he meant

that if Beloit workers were cut down to "minimum severance," the employees would "go off and

find something else to do;" if those workers did not stay, you "don't have a business that you can

sell" – which Readinger felt was "inconsistent with what they were telling me to do, and,

therefore, wrong."  (Tr. at 308-09; *see also* Ex. 114 at 43)  Readinger told Winkleman that "these

guys are putting real pressure on us relative to the severance."  (Tr. at 401)  Winkleman viewed

any potential reduction of severance to minimum (WARN Act) levels as "wrong" for the same

reasons as Readinger.  (Tr. at 402-03)

54.    Hanson testified that Readinger talked to him about the concept of eliminating the

severance policy completely.  (Ex. 109 at 39-40, 46-48)  Hanson and Readinger discussed

alternatives, recognizing that "we had a strong need for retention of employees in those elements

of the business that we thought did have value from an on-going standpoint."  (Ex. 109 at 40)

55.    Readinger and Winkleman tried, through numerous conversations, to develop

alternatives to elimination of severance benefits, hoping that the Committee would accept one.

(Ex. 121 at 70-71; Tr. at 402-03)  Readinger never spoke substantively with any Committee

member or representative, did not "know what they were concerned about," and tried to "make

the best of a bad situation based on" what he was told.  (Ex. 114 at 35-36, 97, 143)  Winkleman

---

[3]Dangremond, in deposition, had no recollection of a conversation with Readinger, or
even any specific recollection of a discussion at any point about severance.  (Ex. 105-6 at 16-18,
24)

also had no substantive contact with the Committee.  (Ex. 118 at 43)  Winkleman viewed the

situation Beloit faced as a "'Sophie's Choice,'" by which he meant that they faced "almost an

impossible choice" or "a very tough decision."  (Ex. 118 at 57-60; Ex. 121 at 70-71)

56.     Readinger presented Hanson with an alternative of creating two tiers of severance

plans, and Hanson "authorized him [Readinger] to proceed or approved his proceeding with his

recommended plan."  (Ex. 109 at 41)  Readinger talked with Dangremond to obtain Committee

approval for the two-tier severance plans and, later, Dangremond informed Beloit that the two-

tier plan was approved.  (Ex. 114 at 87-88; Ex. 121 at 70-71; Tr. at 322, 377)  Readinger had

acted "very quickly" after first learning of the possibility of severance being eliminated because

he thought otherwise the Committee might shut down Beloit immediately.  (Tr. at 377)

57.     The Bankruptcy Court was never asked to approve the changes to the 1996 policy.

(Ex. 114 at 84-85; Tr. at 320)  Nor did Readinger seek approval from the Beloit Board for the

changes to the severance policy.  (Tr. at 320)

58.     Readinger viewed Dangremond, in all their interactions, as acting in a "Chief

Restructuring Officer" role.  (Tr. at 343-60)  Readinger understood at the time that Dangremond

was, until October 26, 1999, Chief Restructuring Officer of only Harnischfeger, and not also

Beloit.  (Tr. at 343)

59.     Dangremond and other Jay Alix employees allocated separate time entries to

specific "Beloit" tasks.  (Ex. 105-8 at 3)  Work they performed specifically for Beloit was paid

for from the Beloit estate.  (Tr. at 290; Ex. 62 at 155)

60.     Dangremond was Harnischfeger's press spokesperson; his name and Chief

Restructuring Officer position were noted in Harnischfeger press releases and in news articles.

(Exs. 105-10, 105-14, 114-19, 114-21, 118-6, 124, 125)  Mid-level Beloit supervisors understood that Dangremond represented Harnischfeger for purposes of "handl[ing] the sale or liquidation of Beloit's assets," and that he was "the guy in charge of what would happen with Beloit."  (Tr. at 128-30, 192-93; Ex. 114-9)

61.     Dangremond perceived any work he did for Beloit as falling "under the umbrella of" his duties to Harnischfeger, even though he was also (eventually) an officer of Beloit as well. (Ex. 105 at 69-70)  In Readinger's view, Dangremond helped "drive the whole bankruptcy process for us" and would frequently come to Beloit and talk with Readinger "about what was going on." (Ex. 114 at 26)  Hanson added that Dangremond played a "key role" in the auction of Beloit assets.  (Tr. at 449)

62.     Carol Ann Mohr, a twenty-one year Harnischfeger employee who had responsibility for all the benefits administered by Harnischfeger, testified that Harnischfeger "had no jurisdiction over [Beloit's severance] plan," which "was strictly handled at the Beloit Corporation level."  (Ex. 112 at 8)

63.     Ross Altman, Beloit's General Counsel, testified that he never observed Harnischfeger directing Beloit's corporate activities, either before or after the bankruptcy filing. (Ex. 101 at 6)  Jay Alix's Kenneth Hiltz testified that all of Harnischfeger's subsidiaries "operated very autonomously." (Ex. 110 at 18)  Hiltz also testified that he was unaware of anyone at Harnischfeger working with Beloit on severance issues or of anyone from Harnischfeger instructing Beloit to "dump" the 1996 severance plan.  (Ex. 110 at 18, 25-26)

### G.     The Creditors Committee

64.     James Bromley, one of the Committee attorneys, confirmed at his 2008 deposition

that: (a) the Creditors Committee questioned whether severance payments were entitled to administrative priority, "[a]nd whether there was a difference between the amount of potential administrative claims that could be attributable to the [WARN] Act, as opposed to whatever the company's policy was with respect to severance;" (b) the Creditors Committee was concerned about the substantial cost of Beloit's severance; (c) Bromley had discussed the severance issue with David Eaton, one of Beloit's attorneys at K&E; and (d) the Creditors Committee wanted "clarity" on the issue and, until that was achieved, "such payments [should] not be made." (Ex. 102 at 8, 12, 16, 22, 28-29)

65.     Bromley discussed severance and administrative priority issues with various individuals but recalled no discussion about the policy being changed in any way. (Ex. 102 at 15, 27-29, 65-67)

66.     The Committee was concerned that severance was being listed under an "Administrative" heading in the October 12, 1999 presentation (Ex. 13 at CG 00455; Ex. 14 at CG 01935) and that the Debtors were treating all severance wages as administrative expenses (Ex. 102 at 27-32, 38-41, 62-63; Ex. 18). Bromley talked several times with Eaton about the Committee's concerns over these priority issues, referencing those concerns and prior discussions about them in a November 1, 1999 letter to Eaton. (Ex. 102 at 28-32, 38-41; Ex. 18) Based on those concerns, Bromley had research conducted on severance wages and priority status in the Third Circuit. (Ex. 102 at 42-43; Ex. 102-10)

67.     In his November 1, 1999 letter, Bromley wrote to Eaton to "follow up on potential claims that may exist . . . relating to severance," and to instruct Beloit that "[g]iven the state of the law in the Third Circuit on the priority status attributable to severance claims" Beloit should

21

"notify the Committee in advance of any payments in respect of severance claims." (Ex. 18)
The Bromley letter also asked for copies of Beloit's severance policies and other materials
relating to the projected costs for severance. (*Id.*) If Beloit were to stop treating severance as an
administrative expense, as the Creditors Committee demanded, then Beloit would not have to
pay full severance to any of the approximately 2,700 Beloit workers eligible for severance under
the 1996 policy, because, as Bromley explained, administrative expenses usually get paid in full
while unsecured claims may get only pennies on the dollar. (Tr. at 405-06; Ex. 19; Ex. 102 at
33)

 68. From February 1998 until the bankruptcy was filed, Readinger presided over
hundreds of Beloit employees being laid off and receiving full severance wages under the 1996
policy. (Tr. at 276, 336-37) After the bankruptcy was filed, Beloit paid full severance wages to
Beloit employees under the 1996 policy as a result of layoffs caused by a plant closing in
September 1999. (Ex. 114 at 22-23, 30-32, 36; Ex. 117 at 84-86, 154; Tr. at 90-91, 103, 337-38;
Ex. 8; Ex. 130 "Exhibit L" (payments under 1996 policy)) Even after November 19, 1999,
numerous Beloit workers were paid the full severance wages they would have received under the
1996 policy. (Tr. at 34, 48-49, 53-56, 65-66, 75-76, 86-87, 122, 133) Winkleman intended that
anyone covered by Severance Policy # 2 (see below) would be paid in full. (Tr. at 432)

 69. Despite Beloit being in dire financial straits, resulting in thousands of layoffs and
other measures, Readinger never considered changing the 1996 policy until being told, in
October 1999, that the Committee wanted severance eliminated. (Tr. at 276, 336-38; Ex. 114 at
30-35) Had he not been told that, Readinger would not have changed the 1996 policy. (Tr. at
309) Despite the costs, Readinger believed that Beloit employees should be paid full severance

pay because it was Beloit's policy and "the right thing to do." (Tr. at 338)

70.     Currer testified that, on business decisions made during the bankruptcy "above a certain level of materiality, Harnischfeger called the shots" and that any "changes being proposed in contracts that were material to the cash position of the corporation" would "often be run by the parent" for "approval" because there were "various checks and balances as to what the division [Beloit] could and couldn't do on its own before phoning home." (Ex. 104 at 11)

71.     Harnischfeger's General Counsel, James Chokey, testified at trial that the Creditors Committee, not Harnischfeger, was pressuring Beloit about severance: "The second call was a report from David Eaton about how strong the Creditors Committee wanted us to, wanted Beloit to change [the] severance policy.  That was a driving issue, and they [kept] raising it all the time, so he was reporting that to me.  He may have reported that to me on a number of occasions, but it was just as part of his reports on what was going on." (Tr. at 471-72)  Chokey also testified that during Readinger's phone call to Hanson to update Hanson on the severance policy (a phone call Chokey listened in on), Chokey did not believe Readinger was asking Hanson's permission to make the suggested changes.  (*Id.*)

72.     Chokey testified at his deposition that Eaton had told him that the Creditors Committee was concerned that "a sale of Beloit in pieces or whatever would result in extensive terminations . . . and those terminations would be very costly." (Tr. at 485-86)

73.     The Creditors Committee was informed of and approved Beloit's decision to amend the 1996 severance policy. (Tr. at 322, 410; *see also* Ex. 25 ¶ 5)  The Committee did not object to the payment of severance under Severance Policy #2 (see below).  (Tr. at 322, 410)

74.     In December 1999, Beloit wrote to the Creditors Committee's counsel to ask

permission to move an additional 41 workers to coverage under the more beneficial Severance Policy #2. (Tr. at 409-10; Ex. 25 ¶ 5)  No objection followed.

**H.    The 1999 Policy Change**

75.    Beloit was insolvent by November 1, 1999.  (UPFOF ¶ 18)

76.    A November 18, 1999 Announcement from Readinger stated that Beloit would be divided into six segments and rescaled to include only competencies associated with tissue and aftermarket (small unit capital, parts, and service).  (Ex. 20)  In coordination with Harnischfeger, the Announcement was followed, on November 19, 1999, by a Harnischfeger press release that tracked the Announcement and directed inquiries to Dangremond, Harnischfeger's Chief Restructuring Officer.  (Tr. at 359-60; Ex. 114-21)  PWCS Managing Director Sudhin Roy confirmed that "HII management" was responsible for this "structural realignment of Beloit" as part of the sale.  (Ex. 111-2 at 14, 26-27)

77.    The November 1999 changes were a "significant major change within Beloit." (Ex. 114 at 110)  Under Beloit's "culture of accountability," important information was routinely communicated to all affected Beloit employees through an "Announcement" attributed to a specific Beloit top manager, but the November 1999 policy changes were communicated to Beloit employees through an unsigned "Memorandum" from "Beloit Corporation" that was distinctly different in format.  (Ex. 114 at 98-100, 105, 107-10; Ex. 27; Ex. 114-17; Ex. 114-20; Tr. at 91-92, 125, 136, 166-67, 318-19)  Readinger had no recall about the preparation of that "Memorandum."  (Ex. 114 at 110-11)  Both the "Memorandum" and policy changes were drafted at K&E.  (Ex. 103-24 at A-37 to A-38; Ex. 103-29 at A-30; Ex. 142; Tr. at 460-63, 487-90)

78.    Effective November 19, 1999, the Beloit 1996 severance policy was amended.

The amendment took the form of two new policies: Severance Policy #1 and Severance

Policy #2.  (UPFOF ¶ 19)

     79.    The text of Severance Policy #1 reads as follows (UPFOF ¶ 20):

### BELOIT

### SEVERANCE POLICY #1 (Paper Group)
(As Amended and Restated November 19, 1999)

1.     This policy, adopted and approved by Beloit Corporation, replaces all existing severance and/or involuntary termination policies dated prior to November 19, 1999.  It applies to all U.S.-based, non-union employees currently assigned to the Paper Group who are not reassigned to the tissue or aftermarket segments of the rescaled Paper Group (as determined by Beloit Corporation) and who are involuntarily terminated without right of recall for reasons other than misconduct.

2.     Severance benefits provided by this policy amendment include the following:

     a)    Any pay and benefits to which the employee is entitled under the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. 2101 to 2109;

     b)    Payment for accrued unused vacation for the current year and any other accrued vacation as required by law; and,

     c)    Continuation of group medical coverage through the end of the month of the severance pay period, provided the employee continues making the appropriate benefit contribution.  This extended coverage will be counted as coverage time under COBRA requirements.

*Beloit reserves the right to amend, modify or terminate any of its policies or benefit plans at any time, including those described in this document.*

80. The text of Severance Policy #2 reads as follows (UPFOF ¶ 21):

## BELOIT

### SEVERANCE POLICY #2
(As Amended and Restated November 19, 1999)

1. This policy, adopted and approved by Beloit Corporation, replaces all existing severance and/or involuntary termination policies dated prior to November 19, 1999. It applies to all U.S.-based, non-union employees who are not covered by Severance Policy #1 (Paper Group) dated November 19, 1999, and who are involuntarily terminated without right of recall for reasons other than misconduct.

2. Severance benefits provided by this policy amendment include the following:

   a) Severance pay in the amount of one week's base salary for each full year of service, with a minimum of 2 week's severance pay and a maximum of twenty-six week's severance pay;

   b) Payment for accrued unused vacation for the current year and any other accrued vacation as required by law; and

   c) Continuation of group medical coverage through the end of the month of the severance pay period, provided the employee continues making the appropriate benefit contribution. This extended coverage will be counted as coverage time under COBRA requirements.

3. Notwithstanding any provision of this Severance Policy to the contrary, an employee is not eligible to receive severance pay under Section 2 above if that employee receives an offer of comparable employment (as determined by Beloit Corporation) with a buyer of all or any portion of the Beloit businesses, whether or not the offer is accepted.

4. The severance benefits provided by this policy do not affect the benefits to which an employee may be eligible for under

26

any applicable state or federal law.

*Beloit reserves the right to amend, modify or terminate any of its policies or benefit plans at any time, including those described in this document.*

81.     Severance Policy #1 was essentially "the federal minimum" and eliminated severance for some workers; Severance Policy #2 generally retained the same severance payments as the 1996 policy. (Tr. at 404; Ex. 22; Ex. 23; Ex. 24)  Initially, the amendment of the severance policy meant that approximately 1,200 workers in the Paper Group would fall under Severance Policy #1, with approximately 1,500 workers eligible for the enhanced severance under Severance Policy #2. (Tr. at 406-07; Ex. 19)  These numbers changed over time as Winkleman sought to move more workers under Severance Policy #2, if he could justify doing so by an objective business reason that could be presented to the Committee. (Tr. at 406-07)

82.     The restructuring of Beloit into six segments was coordinated with Harnischfeger and connected with the change in severance plans. (Ex. 22; Tr. at 319-20, 360)

83.     The severance policy changes were intended to assure that Beloit employees working in the tissue and aftermarket areas received full severance pay while other employees did not. (Ex. 20; Ex. 22; Ex. 23; Ex. 24)  This reflected the economic reality confronted by Beloit, which was summarized by Hanson, Harnischfeger's CEO, who explained that "the after-market business (*i.e.* repair and servicing of the paper machines both under warranty and otherwise) is a very important and high margin business for Beloit." (Ex. 145 ¶ 37)  As Readinger testified, in preparing for the sale of Beloit, the primary investment was "in the Aftermarket infrastructure, the Sales and Service arm out in the field, the customers, to help them keep their machines up and running" because "that was the high margin part of our business."

27

(Tr. at 278) While most other portions of Beloit's business were losing money, the Aftermarket side was "largely profitable." (Tr. at 334-35) Hanson had brought Readinger into Beloit partly because Readinger "understood the strategic direction that I wanted," specifically a "very strong aftermarket model business," which Hanson described as "a service business that also made capital equipment rather than a capital equipment business that also sold parts." (Tr. at 444-45) With Readinger's leadership, Hanson hoped to "drive this aftermarket concept so that it became the main thrust of the business." (Tr. at 444-45)

## I.    Implementation of the 1999 Severance Policies

84.    Winkleman was "almost certain" that Beloit's process of moving employees from Severance Policy #1 to Severance Policy #2 would have appeared arbitrary to Beloit's employees. (Tr. at 407-08) This was because in many cases "they were spur of the moment decisions" where Beloit "would get a level of interest in a particular piece of business or a particular contract," and it "would have to scramble" to move people into that position with the inducement of the enhanced severance. (*Id.* at 408) In Winkleman's words: "it was kind of a moving target," and "with some degree of regularity . . . people who were in the Paper Group got moved over into Severance Policy No. 2, which didn't make any of us sad, but it was, it was done again for practical reasons." (*Id.* at 406)

85.    Beloit HR manager Laura Nigbur and Beloit Human Resources Director Brian Brunner received no advance notice or information regarding the November 1999 changes to Beloit's severance policies. (Tr. at 88, 91-98, 111) This was despite the fact that Nigbur was responsible for administering severance, compiling severance materials, calculating wages due, and meeting with employees. (Tr. at 88-89) The "Memorandum" announcing the changed

28

policy advised employees to "direct any questions you may have regarding these policies to your local Human Resources representative" (Ex. 22), but Nigbur first learned of the change at the same time as all other Beloit employees. (Tr. at 91-93; Ex. 115 at 4, 23)

86.     In December 1999, a "Questions and Answers" document was posted on the official Beloit bulletin board, stating that the severance eligibility changes were attributable to "the lending of . . . money to Beloit." (Ex. 157 at 7; Tr. at 123-24, 207-10) Harnischfeger, as guarantor of DIP financing, was liable for money Beloit borrowed and did not pay back. (Ex. 121 at 64) A March 6, 2000 "Questions and Answers" document, e-mailed by Beloit HR to Beloit employees, stated that the limit on the number of employees selected to receive severance pay was set by the "parent company." (Ex. 161; Tr. at 126) Beloit supervisors and officers testified that, within Beloit, "parent company" meant Harnischfeger. (Tr. at 127-28, 139, 182-83, 219-22, 330-31, 387-90)

87.     Art Goldsworthy held an Aftermarket position in Customer Service at Beloit for ten years until he left in April 2000. (Tr. at 115-21, 135) After the November 1999 changes, Steve Bennett, a supervisor above Goldsworthy's immediate supervisor, assured Goldsworthy and his colleagues that each of them would receive severance pay. (Tr. at 116-19) He told them that unless employees were immediately given WARN notices (i.e., an indication that they would receive only the federal minimum benefits) they would receive severance pay. (*Id.*) Goldsworthy first received a WARN Act notice more than two months later, however, and was only at that point told he would not get severance. (*Id.*) In February 2000, the situation changed again, and Goldsworthy was told that he would get severance. (*Id.*) Ultimately, he did receive full severance pay. (Tr. at 122) His duties had not changed. (Tr. at 119, 135)

88.     Dan Morris was employed at Beloit for 26 years until being involuntarily terminated on March 23, 2000. (Tr. at 141-42) From August 1993 forward, he worked as a salaried supervisor exclusively in the Aftermarket area. (Tr. at 156-58, 163-64) As a result, when Morris received the November 18, 1999 announcement about restructuring Beloit and the November 19 Memorandum about the severance policy changes, he had no doubt that he was in the Aftermarket group and that, absent further changes, he would receive severance. (Tr. at 163-64) His conclusion that he, and those he supervised, were unaffected and would receive severance was confirmed by Ray Massey, Vice President of Service, and Morris conveyed this confirmation to those he supervised. (Tr. at 163-64, 203-07, 209-10)

89.     Many Aftermarket employees continued at Beloit after the bankruptcy in reliance on the promises that they would receive severance and, later, to preserve their claims to that severance. (Tr. at 117-22, 178-81, 195-97, 211-14) The 1996 policy was important to employees in deciding to move from union positions, with recall rights, to non-union positions that had no such rights. (Tr. at 177-78) As the bankruptcy proceeded, and particularly after the sale of Beloit was announced, the 1996 policy became a more important reason for employees to stay with Beloit. (Tr. at 196-97) The 1996 policy was a "very important" factor in employees' decisions to stay on during the bankruptcy, which was critical in the service part of Aftermarket because the service business hinged on customer loyalty to particular service people. (Tr. at 179-81) Morris personally reminded those he supervised, and other Aftermarket employees, that entitlement to severance was a "lifeline." (Tr. at 197)

90.     Expectations by Aftermarket workers that they would receive severance pay were often not borne out. Many Aftermarket workers who Beloit retained from November 19, 1999

30

forward received WARN Act notices more than two months later stating that they were covered by Severance Policy #1 and would receive no severance pay. (Tr. at 118, 211, 214) Morris thought the WARN Act notice he received was just a mistake; he went into work the next day to get the error corrected and found a line of people whom he supervised, whose duties involved strictly Aftermarket work, waiting outside his office with similar letters. (Tr. at 211-12, 214-15) When Morris left Beloit on March 23, 2000, most Aftermarket people that he worked with were not scheduled to receive severance. (Tr. at 219) Many former Beloit workers who now work with Goldsworthy at Paperchine, an Aftermarket company, did not receive severance from Beloit, even though they performed Aftermarket tasks at Beloit. (Tr. at 121)

91.     In sum, the Court finds the following facts relating to the circumstances leading to the change in Beloit's severance policies:

a.     The Committee wanted Beloit to stop paying so much for severance.

b.     The Committee exerted pressure on Beloit to stop paying so much in severance.

c.     The Committee conveyed its concern and pressure regarding Beloit's severance policies through Dangremond and Currer.

d.     Dangremond and Currer's actions, including those surrounding the Committee's October 15, 1999 meeting, are attributable to Harnischfeger, as Dangremond was a Harnischfeger officer.

e.     Dangremond and Currer, as Jay Alix consultants, also had a (court-approved) role to play to support Beloit.

f.     As a result of learning of the Committee's desire that Beloit reduce its severance expenses, Readinger felt pressure to have Beloit stop paying so much in

31

severance.

g.    Readinger and Winkleman thought it would be wrong, and harmful to Beloit, to stop paying severance.

h.    Readinger and Winkleman devised the idea to separate employees into two groups, and to provide one group (Group 2) with essentially the same severance as all employees had been entitled to under the 1996 policy, and to provide the remaining group (Group 1) with the WARN Act minimum severance.

**J.    DWD's Wage Claim**

92.    Wisconsin wage claim issues addressed by DWD are normally resolved within 90 days.  (Tr. at 72)

93.    Having not received severance, and then having waited a decade after being laid off from Beloit until getting to trial, had adverse consequences for the former Beloit workers on behalf of whom this action is pressed.  (Ex. 129; Tr. at 227-32)  Without severance to rely on while searching for new employment, former Beloit workers took menial jobs and were then unable to locate more suitable employment.  (Tr. at 227-32)  Loss of the promised severance benefits diminished the employees' feelings of self-worth.  (*Id.*)  Some former employees needed medical help, some lost homes, some saw their marriages end in divorce.  (*Id.*)  Others felt like fools for hanging on for months past the bankruptcy and then getting no severance.  (*Id.*)

94.    Each former Beloit worker listed on Exhibit 129 was eligible for severance under the 1996 policy and substantially performed under the 1996 policy before being informed that, due to the 1999 amendments, he or she would not receive the severance that had previously been promised.  (Tr. at 19-87, 117-21, 164-66, 171-74, 177-81, 195-97, 211-13; Ex.126; Ex. 127; Ex.

128; Ex. 129; Ex. 130)

95.     The severance wages that would have been owed under the 1996 policy to each

former Beloit worker listed on Exhibit 129 totals $4,771,668.43.  (Tr. at 19-87; Ex.126; Ex. 127;

Ex. 128; Ex. 129; Ex. 130)

96.     The amount of severance wages owed to each former Beloit worker under the

1996 policy, as listed on Exhibit 129, has been known to Harnischfeger since it took over Beloit

payroll functions in May 2000.  That amount has further been known since DWD issued its

March 8, 2001 determination.  (Tr. at 19-87, 122; Ex. 126; Ex. 127; Ex. 128; Ex. 129; Ex. 130)

97.     On November 10, 2000, DWD filed a proof of claim in the bankruptcy

proceeding, Case No. 99-2171 (PJW), against Beloit Corporation on behalf of 378 identified

former employees of Beloit, alleging a violation of law through failure to pay severance benefits.

(UPFOF ¶ 22)

98.     Also on November 10, 2000, DWD filed a proof of claim in the bankruptcy

proceeding, Case No. 99-2171 (PJW), against Harnischfeger on behalf of 378 identified former

employees of Beloit, alleging that Harnischfeger violated Wisconsin law in relation to severance

pay owed to those former Beloit employees under two theories of liability: (1) Harnischfeger was

liable as the alter ego of Beloit for Beloit's failure to make severance payments; and

(2) Harnischfeger tortiously interfered with contracts Beloit had with Beloit employees when, as

part of the bankruptcy proceedings, Harnischfeger induced Beloit to change its severance policy.

(UPFOF ¶ 23)

99.     Each former Beloit worker, on whose behalf DWD is seeking severance pay, was

an exempt non-union employee permanently terminated from Beloit, after November 19, 1999,

for reasons other than misconduct or employee initiative.  (UPFOF ¶ 24)

100.    None of the former Beloit workers listed in Exhibit 129 and on whose behalf DWD is seeking severance pay received any severance payments at the time of their termination of employment with Beloit.  (UPFOF ¶ 25)

101.    DWD's proofs of claim were withdrawn to the district court on February 15, 2001, pursuant to 28 U.S.C. § 157(d), on the motion of Harnischfeger and Beloit.  (UPFOF ¶ 26)

102.    By order dated April 17, 2001, this Court ruled on priority status issues.  (D.I. 67) This Court's April 17, 2001 Order was affirmed on appeal.  *See In Re: Joy Global, Inc.*, Civ. No. 02-2141, slip op. at 6-7 (3d Cir. July 2, 2003).  (UPFOF ¶ 27)

103.    Beloit did not emerge from bankruptcy; rather, its assets were divided into separate business units and sold with the Bankruptcy Court's approval for the benefit of Beloit's creditors.  Various buyers bid on certain of segments of Beloit's business at an auction that took place on January 10-11, 2001, pursuant to auction procedures approved by the Bankruptcy Court. (Case No. 99-2171, D.I. 1594, 2076, 2165)  After the auction, the Bankruptcy Court issued a series of Orders approving sales of Beloit's property to various buyers.  (Case No. 99- 2171, D.I. 2290-91, 2386-88, 2647-48, 2709-10, 2845-46, 3276-77, 3564, 3744, 3881, 4175, 4180-82, 4184, 4188, 4879-4880, 5185, 5467, 5338).  (UPFOF ¶ 28)

104.    Harnischfeger emerged from Chapter 11 bankruptcy reorganization on July 12, 2001 as Joy Global, Inc.  (UPFOF ¶ 29)  Harnischfeger could have claimed, but agreed to forego, $22 to $25 million from the sale of Beloit based on the $750 million that Harnischfeger had provided Beloit before the filing of the bankruptcy.  (Ex. 62 at 154-55)

105.    On April 16, 2004, the Bankruptcy Court in Case No. 99-2171 (PJW) approved an

agreement between DWD and the Beloit Liquidating Trust to settle DWD's claim against Beloit. DWD expressly stated in the agreement that it reserved all claims against Joy Global including, without limitation, claims made on behalf of the 378 former Beloit workers. (D.I. 475, ¶ 14 & Ex. M; D.I. 484, ¶ 14) Joy Global is not a party to that settlement agreement. Through the settlement agreement, those Beloit workers on whose behalf DWD was seeking severance pay who chose to opt in received a percentage of the severance pay Beloit allegedly owed them based on Beloit's 1996 severance policy (which DWD had claimed on their behalf). Subsequently, the parties stipulated to dismiss Beloit with prejudice, as to the employees who opted in, and change the case caption to reflect Beloit's dismissal. (D.I. 140-41; UPFOF ¶ 30)

106. The total amount of the settlement between Beloit and DWD was $490,525.36. (UPFOF ¶ 31)

107. DWD withdrew its alter ego claim against Harnischfeger (now Joy Global, Inc.) in statements to the Court on the record during oral argument on September 25, 2007. (D.I. 284; D.I. 475, ¶ 15 & Ex. N; D.I. 484, ¶ 15; *see also* UPFOF ¶ 32)

108. DWD seeks damages measured by the amount of severance pay and increased wages. (UPFOF ¶ 33)

## LEGAL CONCLUSIONS

### I.    Legal Standard for Tortious Interference

The elements of a claim for tortious interference with a contract under Wisconsin law are: "'(1) the plaintiff must have had a contract or a prospective contractual relationship with a third party; (2) the defendant must have interfered with that relationship; (3) the interference by the

defendant must have been intentional; (4) there must be a causal connection between the interference and damages; and (5) the defendant must not have been justified or privileged to interfere.'" *Finch v. Southside Lincoln-Mercury, Inc.*, 274 Wis. 2d 719, 737 n.8 (Wis. Ct. App. 2004) (quoting *Select Creations, Inc. v. Paliafito America, Inc.*, 911 F. Supp. 1130, 1156 (E.D.Wis. 1995)); *accord Brew City Redevelopment Group, LLC v. Ferchill Group*, 297 Wis. 2d 606, 624 n.9 (Wis. 2006); *Wolnak v. Cardiovascular & Thoracic Surgeons of Cent. Wis., S.C.*, 287 Wis. 2d 560, 574 (Wis. Ct. App. 2005).

Wisconsin has adopted the Restatement (Second) of Torts, section 766 (1979) with regard to the tort of intentional interference with performance of a contract. *See Wolverine World Wide, Inc. v. Cams, Inc.*, 2009 U.S. Dist. LEXIS 20299, at *12 (W.D. Mich. Mar. 13, 2009) (applying Wisconsin law and collecting cases). Under section 766, one who "intentionally and improperly interferes with the performance of a contract" may be liable for such conduct. *Id.*; *accord Briesemeister v. Lehner*, 295 Wis. 2d 429, 453 n.8 (Wis. Ct. App. 2006); *Mackenzie v. Miller Brewing Co.*, 234 Wis. 2d 1, 608 N.W.2d 331 (Wis. Ct. App. 2000) (noting that "interference alone, however, does not establish the tort; the interference must be improper"); *Liebe v. City Fin. Co.*, 98 Wis. 2d 10, 295 N.W.2d 16, 19 n.4 (Wis. Ct. App. 1980).

To have the requisite intent, the defendant must act with a purpose to interfere with the plaintiff's contract. *See Dorr v. Sacred Heart Hosp.*, 228 Wis. 2d 425, 456-58 (Wis. Ct. App. 1999). Liability will be found only when the actor "knew that the interference was certain, or substantially certain, to occur." *Id.* at 458 (internal quotation marks omitted). Thus, Wisconsin's model civil jury instructions direct that "'[a]lthough other reasons may appear, (plaintiff) must prove that (defendant)'s prime purpose was to interfere with the contractual relationship

(plaintiff) had with (3rd party) or (defendant) knew or should have known that such interference was substantially certain to occur as a result of the conduct.'" *Briesemeister*, 295 Wis. 2d at 453-54 (quoting WISCONSIN JI-CIVIL 2780).

Causation exists where the defendant's actions are a "substantial factor" in producing the harm to the plaintiff. *Wolnak,* 287 Wis. 2d  at 575-76; *see also Baumeister v. Automated Prods., Inc.,* 277 Wis. 2d 21, 39-40 (Wis. 2004); *World Wide Prosthetic Supply v. Mikulsky*, 246 Wis. 2d 461, 473-74 (Wis. Ct. App. 2001). A defendant's conduct is a substantial factor when it "'has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense.'" *Wolnak,* 287 Wis. 2d at 575-76 (quoting *Fischer v. Ganju*, 168 Wis. 2d 834, 857 (1992)). There may be more than one cause of an injury. *See Ehlinger v. Sipes*, 155 Wis. 2d 1, 13 (Wis. 1990).

DWD bears the initial burden of proof to establish a prima facie case for tortious interference with a contract. *See Cudd v. Crownheart*, 122 Wis. 2d 656, 661 (Wis. Ct. App. 1985); *see also Chrysler Corp. v. Lakeshore Commercial Finance Corp.*, 389 F. Supp. 1216, 1221-22 (E.D. Wis. 1975) (applying Wisconsin state law); WIS. JI-CIVIL 2780 (2003). Thus, DWD must establish the first four elements by a preponderance of the evidence. *See* WIS. JI-CIVIL 2780. The burden of proving lack of privilege, however, is not ascribed to the plaintiff. *See id.*; *see also Finch v. Southside Lincoln-Mercury, Inc.*, 274 Wis. 2d 719, 749 (Wis. Ct. App. 2004). Rather, "the burden of proving the justification for such interference [rests] upon the defendant." *Chrysler Corp.*, 389 F. Supp. at 1221; *see also* WIS JI-CIVIL 2780.

"Traditionally, courts discuss the exceptions to the general rule concerning intentional interference with a contract in terms of a 'privilege' to interfere." *Breisemeister,* 295 Wis. 2d at

37

453 n.8 (internal quotation marks omitted).  With respect to whether a defendant is "privileged"

to interfere with an existing contract, courts have "substituted a concept of 'propriety' for

'privilege' and provided that one who intentionally and improperly interferes with the

performance of a contract is liable." *Mackenzie,* 234 Wis. 2d at 47-48 (citation omitted).

When determining whether conduct was privileged, the fact-finder must consider the

totality of the circumstances. *See Wolverine,* 2009 U.S. Dist. LEXIS 20299, at *13-14 (citing

*Briesemeister*, 295 Wis. 2d at 453).  Specifically, the trier of fact should consider the "nature,

type, duration and timing of the conduct, whether the interference is driven by an improper

motive or self-interest, and whether the conduct, even though intentional, was fair and reasonable

under the circumstances." *Briesemeister*, 295 Wis. 2d at 453; *see also Mackenzie,* 234 Wis. 2d at

47-48 ("Determining whether interference is 'improper,' we consider: (a) the nature of the actor's

conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct

interferes; (d) the interest sought to be advanced by the actor; (e) the social interests in protecting

the freedom of action of the actor and the contractual interest of the other; (f) the proximity or

remoteness of the actor's conduct to the interference; and (g) the relations between the parties.");

Restatement (Second) of Torts § 767 (1979).

The Restatement (Second) of Torts (hereinafter "Restatement") also provides

particularized privilege defenses to a charge of intentional tortious interference with a contract:

"competition (§ 768), financial interest in the business of the person induced (§ 769),

responsibility for the welfare of the third person (§ 770), inducement in order to influence the

business policy if the actor has an economic interest at stake (§ 771), disclosure of truthful

information or advice that induces forbearance (§ 772), and assertion of a bona fide claim which

causes nonperformance (§ 773)." *Select Creations v. Paliafito Am.*, 911 F. Supp. 1130, 1159

(E.D. Wis. 1995) (citing Restatement §§ 768-73). Thus, in addition to the factors considered

under the totality of the circumstances test, "when there is a more specific Restatement section

relating to the tortious interference, [courts] follow the more specific section." *Sparks v.*

*Waukesha Bearings Corp.*, 145 Wis. 2d 896, 896 (Wis. Ct. App. 1988); *see also Liebe*, 98 Wis.

2d at 15 (holding that, if applicable, the specific privileges found in Restatement sections 768-

773 control over the factors listed in section 767); *Breisemeister*, 295 Wis. 2d at 454-55 (noting

general applicability of totality of circumstances test but then analyzing defendants' privilege

defense under Restatement section § 773).

## II.    Analysis

The Court addresses below each of the elements of DWD's claim that Harnischfeger

tortiously interfered with the contractual rights of the former Beloit employees to receive

severance payments from Beloit. The Court further addresses Joy Global's assertion that any

such interference was privileged. The Court concludes that the former Beloit employees had a

contractual right to severance, and that Harnischfeger interfered with that contractual right,

resulting in damage to the former Beloit employees. However, the Court further concludes that

Harnischfeger's interference was not intentional under the applicable standards of Wisconsin

law. Moreover, even if DWD had succeeded in proving all of the elements of its tortious

interference claim, which it did not, Harnischfeger demonstrated that its interference was

privileged.[4]

--------

[4]Given the Court's finding that DWD failed to make a *prima facie* case of tortious
interference, it is not necessary for the Court to address each of the other elements of DWD's
claim and Harnischfeger's defenses. Nonetheless, the Court has chosen to do so under the

A.      **Were the Severance Contracts Enforceable**?

With respect to the first element of tortious interference, the Court has determined on

several occasions that there is an enforceable contract at issue in this case.  *See* D.I. 511 at 8 n.3;

*In re Joy Global, Inc.*, 381 B.R. at 619-20; D.I. 523 at 15 (Joy Global's statement acknowledging

Court's previous holding that no factual dispute exists on this point).

B.      **Did Joy Global Interfere with the Severance Contracts?**

DWD contends that Harnischfeger officials – specifically John Hanson, Kenneth Hiltz,

and Robert Dangremond – interfered with the former Beloit employees' contractual rights to

severance payments from Beloit, and this interference caused Beloit to breach the contracts.  (D.I.

555-2 at 22)  The Court concludes that while neither Hanson nor Hiltz interfered, the evidence

supports the conclusion that Dangremond did.

The evidence of interference by Hanson and Hiltz requires little discussion.  First, with

respect to Hanson, the evidence establishes that he did not interfere with Beloit's severance

contracts with the former Beloit employees.  Hanson was told by Readinger of the change in the

severance policies; Hanson did not direct that those changes occur.  (Tr. at 309, 453)  Chokey,

Harnischfeger's general counsel, was on the call in which Readinger reported to Hanson on

Beloit's decision to change the severance policies.  (Tr. at 471-72)  Chokey heard Readinger tell

Hanson what Readinger had decided; he did not hear Readinger seek permission to do so.  (*Id.*)

While Hanson and Readinger discussed what Beloit should do about its severance plans (Ex. 109

---

unique circumstances of this case, which include that this case has taken a full decade to reach
final judgment, spending time in the courtrooms of no fewer than three district judges, two
magistrate judges, and a bankruptcy judge. *See also generally* Tr. at 72 (DWD's Budack
testifying that this case is "by far the longest case that has ever been in the Department [i.e.,
DWD]").  It has also been in the Court of Appeals twice and may return there.

at 39-40, 46-48), and Hanson authorized Readinger to proceed with Readinger's proposed amendments (*id.* at 41), they were Readinger's amendments, and there is no evidence that Hanson directed Beloit to change its severance policies. Instead, the record demonstrates that Readinger and Winkleman came up with the idea to amend the severance policies, not Hanson.

There is essentially no evidence of interference by Hiltz. The only theory DWD offers that Hiltz interfered is that he conveyed to Readinger the Committee's interest in seeing Beloit's severance policies changed. (D.I. 555-2 at 10) ("Either Dangremond or Hiltz, who were each then Harnischfeger officers, and most likely Dangremond, told Readinger in October 1999 that the Committee wanted all severance beyond what was required by law eliminated.") However, as explained below, the Court concludes that this message was conveyed to Beloit by either Dangremond or Currer, not Hiltz.

Turning to the evidence of interference by Dangremond, three issues must be resolved: (i) did the Committee want to see Beloit reduce its severance expenses? (ii) did Dangremond communicate the Committee's desires to Readinger? and (iii) if Dangremond did so, was he acting on behalf of Harnischfeger? The Court concludes that the answer to each of these questions is "yes."

First, the record demonstrates that on October 15, 1999, the Creditors Committee analyzed all of Beloit's major expenses, including severance, and identified severance as an area of potential savings. During the Committee meeting, PWCS made a presentation of the "Debtors' recommendations." (Exhibit 16 at CG02630) PWCS showed the financial implications of various scenarios, including divestiture and liquidation. (Exhibit 15 at CG00123) (listing "Administrative/Priority . . . Claims at Beloit" as having value in range of $24 to $123

41

million)  Specifically, in a liquidation scenario, severance was listed as by far the most expensive administrative expense, valued in a range of $30 million to $70 million, with a note: "Low case assumes Warn Act only, high case assumes severance policy."  (Exhibit 15 at CG00133)  Around the time of this meeting, Readinger was told that the Creditors Committee wanted the 1996 severance policy changed, because "cash paid to [terminated] employees was not something that [the Committee] care[d] to do;" he was further told that the Committee was "very close to edicting that they [were] not going to pay any more severance other than the bare minimum mandatorily required by the WARN Act."  (Ex. 114 at 41-42, 46-47; Tr. at 307)

DWD contends that the Committee actually was concerned only with the administrative priority given to severance and not with the substance of the severance policies themselves.  (D.I. 555-2 at 23)  In DWD's view, the Committee preferred that the policies not be amended, since an amendment had the potential to trigger administrative priority status for severance expenses in the bankruptcy.  (*Id.*)  The Court concludes that the Committee wished to see Beloit's severance expenses reduced, regardless of the specific mechanism by which such a reduction was accomplished.  What matters – and the only basis in the record for finding any "interference" with severance by Harnischfeger – is that a Harnischfeger officer (Dangremond) communicated the Committee's generalized "pressure" to reduce severance expenses to Beloit.[5]

Second, the record demonstrates that Dangremond, or his fellow Jay Alix consultant William Currer, communicated the Committee's desire to see Beloit's severance expenditures

---

[5]In any event, DWD's contention that the Committee's concern was only with the type of priority classification afforded the severance contracts and not about the substance of the contracts themselves is undermined by, among other pieces of evidence, the absence of any record of objection by the Committee to Beloit's specific plan to modify the policies.

reduced, including by communicating the results of the Committee's October 15, 1999 meeting to Beloit's Readinger. At his deposition, Readinger identified the person who told him these things as most likely Dangremond, and certainly someone at the Dangremond or Hiltz "level," but definitely not Currer. (Ex. 114 at 87-88) At trial, Readinger testified that if Currer had been the speaker who conveyed to him the Committee's desire to eliminate severance in excess of the WARN Act, Readinger would have viewed Currer as speaking for Dangremond, whom Readinger understood to be a Harnischfeger officer. (Tr. at 360, 377-78) It is not necessary to determine whether the speaker was Dangremond or Currer because Currer was Dangremond's "right-hand man" and was viewed as such by Readinger. (Tr. at 288) Therefore, whether Dangremond spoke directly to Readinger or indirectly through his associate, Currer, the statement is Dangremond's.

Third, in the October 1999 time period in which Dangremond (either directly or through Currer) communicated the Committee's desires to Readinger, he was acting, at least in part, in his capacity as a Harnischfeger officer. While it was as early as October 7, 1999 that the Beloit Board of Directors made Dangremond the chair of a "team" tasked with soliciting offers for the sale of Beloit's assets (Ex. 11 at 2), it was not until October 26, 1999 that Dangremond was appointed Beloit's Senior Vice President and Chief Restructuring Officer (Ex. 17). Dangremond viewed his loyalties as belonging to Harnischfeger, the entity that indemnified and insured him against officers' liability. (Ex. 6 at 1-2, 5; Tr. at 449; Ex. 110 at 6; Ex. 105 at 46-47) Additionally, Dangremond is named as the contact person on at least two Harnischfeger press releases issued in October and November 1999 discussing sale of Beloit. (Ex. 105-14; Ex. 114-21)

It is correct, as Joy asserts, that Readinger believed that Dangremond advised Readinger in his (Dangremond's) capacity as consultant to Beloit (Tr. at 289) and that this consulting relationship with Beloit was one that had been authorized by the Bankruptcy Court (Ex. 56). Further, Dangremond and other Jay Alix employees specifically allocated separate time entries to "Beloit" tasks (Ex. 105-8 at 3), and work done for Beloit was paid for by the Beloit estate (Ex. 290; Ex. 62 at 155). Dangremond also had his own office at the Beloit headquarters. (Tr. at 288) All of this merely establishes that Dangremond was "wearing multiple hats" in October-November 1999, including serving as a Harnischfeger officer and a Beloit consultant. When communicating with Readinger the desires of the Committee regarding Beloit's severance policies, Dangremond was acting at least in part in his capacity as a Harnischfeger officer, and did so to an extent sufficient to attribute Dangremond's "interference" to Harnischfeger.

The Court concludes that the act of communicating the Creditors Committee's alleged desire to cut the Beloit severance contracts to legal minimums constituted interference with those contracts. Because Dangremond was simultaneously a Harnischfeger officer and a consultant (through Jay Alix) to Beloit, it is not entirely clear in which capacity Dangremond (or Currer) communicated the pressure from the Committee to Readinger regarding the severance policies. Despite the lack of clarity, the Court finds by a preponderance of the evidence that Dangremond was acting on behalf of Harnischfeger. Therefore, DWD has met its burden with respect to this second element of its tortious interference claim.

### C.   **Was Joy Global's Interference Intentional**?

The next element DWD must prove is that Dangremond's interference with the former Beloit employees' severance benefits was intentional. This requires DWD to establish, by a

44

preponderance of the evidence, that Harnischfeger, through Dangremond, intended to interfere with the former employees' contractual right to severance benefits from Beloit.  To demonstrate such intentionality, the record must show that Harnischfeger either had as its "prime purpose" the interference with the former Beloit employees' right to severance or knew that interference with the Beloit employees' severance rights was substantially certain to occur as a result of Harnischfeger's conduct.  DWD has failed to meet its burden of proof on the intentionality element of its claim.

DWD argues that Harnischfeger acted for the purpose of interfering with Beloit's 1996 severance contracts.  (D.I. 555-2 at 27)  Specifically, Dangremond, as a Harnischfeger official, explicitly instructed Readinger that the severance contracts would cost too much and that the Committee wanted them to go unpaid.  DWD further contends that, even if Joy Global is correct that "Dangremond's chief purpose was to please the Committee and gain its trust — or even that Dangremond was motivated by a laudable broader goal – that would not negate the intentionality of the interference with the severance contracts."  (*Id.* at 27-28)

Joy Global responds that no evidence supports the claim that Dangremond, or anyone else at Jay Alix Associates, communicated with Readinger for the purpose of interfering with Beloit's severance policy or causing Beloit to change the 1996 policy.  (D.I. 557 at 25)  Joy Global emphasizes that, rather than gain financially from Beloit's decision to change the policies, Harnischfeger lost hundreds of millions of dollars by trying to keep portions of Beloit's business alive and eventually relinquished its claim against Beloit's assets.  (*Id.*)  According to Joy Global, the purpose of the Jay Alix employee who communicated with Readinger was to keep Beloit informed about the Committee's instructions and concerns, which was one of Jay Alix's court-

approved roles as advisor to Beloit. (*Id.* at 25-26)  Further, Beloit and its advisors, including Jay

Alix, "had a fiduciary duty to act in the best interests of the [Committee]." (*Id.*)  There is no

dispute that one of Jay Alix's roles as Beloit's advisor was to attend Committee meetings and act

as a liaison between Beloit and the Committee. (*Id.*)

      DWD has failed to prove by a preponderance of the evidence that Dangremond, or

anyone else at Harnischfeger or Jay Alix, intended to interfere with the Beloit 1996 severance

contracts.  The evidence shows that Dangremond (directly, or indirectly through Currer) passed

along the Committee's concerns about Beloit's severance policies as part of his duties as liaison

between the Committee and Beloit (as well as the other Debtors).  Although Dangremond was

acting on behalf of Harnischfeger and the Committee during this exchange, the fact that part of

his job was to pass along information precludes the inference that just because he passed along

information means that he also must have intended to interfere with the substance of the matters

about which he was passing along information.  There is scant evidence that Dangremond was

involved with the Beloit severance policies in his roles as Chief Restructuring Officer or as head

of the team tasked with soliciting offers to buy Beloit's assets.[6]  Similarly, there is no evidence

that Dangremond participated in Readinger's process of planning his steps in reaction to learning

of the Committee's concerns.

      Because Dangremond was simultaneously serving as a Harnischfeger officer as well as a

court-approved, paid consultant to Beloit, it would have been reasonable and entirely predictable

that Dangremond would have communicated to Readinger the Committee's views about

---

[6](*See, e.g.,* Ex. 110 at 16, 22-25 (Hiltz's testimony that Dangremond's role as head of
team tasked with selling Beloit assets was substantively unrelated to the severance issues))

severance – as well as about all other Beloit expenses – independent of any interest

Dangremond's other employer (Harnischfeger) may have had in seeing Beloit reduce its

severance expenses. Readinger felt pressure from the Committee, not from Harnischfeger, as a

result of the phone call from Dangremond or Currer. (Tr. at 328)[7] Readinger testified that upon

filing for bankruptcy, the attorneys at K&E explained "we had some new bosses, and they are

called the Creditors Committee." (Tr. at 281-82) K&E said the Committee could be thought of

as a "super board." (Tr. at 282)

> Readinger testified, credibly:
>
> I recall being informed that, on the initial call on October 15th and then in
> subsequent conversations with Dangremond and his crew, that the Creditors
> Committee was not going to stand and have us pay according to the policy in
> 1996. They were going to edict that everybody gets a WARN notice unless we
> could come up with a compelling business case. So that is what we did very
> quickly, and it ended up being submitted to the Creditors Committee is what I was
> told. And they were in favor of it.

(Tr. at 377) Readinger understood that the Committee did not want to pay any more severance.

At Readinger's direction, the Beloit team came up with a "compelling business reason" to give

some severance to those employees in the units that would be sold as going concerns, as this

would allow Beloit to obtain a higher purchase price for these units. It was very much in Beloit's

interest, then, to retain certain employees. Readinger made the decision to split Beloit into the

Paper Group – for which no buyer was interested, which had to be downsized, which would be

sold in pieces, and for which, therefore, employees would only receive WARN benefits – and the

Rescaled Paper Group – which was going to be sold as a going concern at a higher value, and

---

[7]Readinger was never directed by Harnischfeger to do anything in connection with
Beloit's bankruptcy. (Tr. at B-326)

therefore needed to retain its employees, leading to the offer of severance benefits.

Winkleman, like Readinger, did not consult with Harnischfeger on severance. (Tr. at 388) He, too, recalled it being "stressed" by the attorneys upon the bankruptcy filing that "[y]ou now have a new banker," the creditors, who "control the purse strings." (Tr. at 393) Readinger told Winkleman "these guys," meaning the creditors, were putting pressure on Beloit regarding the severance (Tr. at 401-02) Winkleman understood that Beloit "needed [a] good rationale" and a "business reason" to persuade the Creditors Committee to spend money. (Tr. at 407)

Readinger, with help from Winkleman and others at Beloit, decided on all the specifics of the changes in the severance policies, and the results were amendments – and implementation – that could not have been either intended or foreseen by Harnischfeger (or the Committee). Winkleman explained that he and Readinger decided to split Beloit's employees into two groups, one that would continue to receive essentially the same severance benefits as before (Policy #2) and the other that would receive only the federal minimum (Policy #1). (Tr. at 402-04) Winkleman felt it was "wrong" to hurt employees by reducing their benefits, and also would hurt the company by making it difficult for Beloit units to be sold for as high a price as possible as ongoing concerns. (Tr. at 402-03) In the end, all but 341 of Beloit's former employees received severance benefits essentially equal to what they would have received absent the 1999 amendments.[8]

_____

[8]The creation of Severance Policy #2 meant that, initially, about 1,200 workers fell under Policy #1, while about 1,500 workers were eligible for the enhanced severance under Policy #2. (Tr. at 406-07; Ex. 19) The numbers changed as Winkleman, Beloit's head of HR, sought to move more workers into Policy #2 if justified by an objective business reason that could be presented to the creditors. (Tr. at 406-07) Winkleman was adamant that no one at Harnischfeger ever told he or Readinger who to put in Group 1 or Group 2. (Tr. at 409)

There is no evidence that anyone at Harnischfeger directed Dangremond to communicate the Committee's desires regarding Beloit's severance policies, much less that Harnischfeger did so with an intent to see Beloit's policies changed. The only thing DWD can point to that approaches such a showing is Exhibit 161, a two-page document entitled, "Q&A For the Rescaled Paper Group." In a question-answer format, the document describes the Rescaled Paper Group ("RPG") as, "[i]n general, a scaled down Aftermarket Group focused on parts and a few limited upgrades," and explains that if an employee has not received a letter indicating he or she is part of the RPG then he or she is covered by Severance Policy #1. Among the twelve questions and answers is the following: "Q. How was the number picked of about 100 for the RPG? A. Decision by parent company for the Rescaled Paper Group" (emphasis added). Several former Beloit employees testified that "parent company," generally and in Exhibit 161 in particular, referred to Harnischfeger. (Tr. at 127-28, 221-22)

Readinger denied that the "parent" referred to in this document is Harnischfeger. (Tr. at 326)[9] It appears to the Court that the reference to the "parent" in Exhibit 161 is to Beloit, as the "parent" of the different groups, including the RPG. However, even assuming that the "parent company" referred to in Exhibit 161 is Harnischfeger, the decision being referred to here is the decision of which employees to place in the RPG; it is not the decision of which severance to give RPG employees and, more importantly, it is not the decision as to what severance to give non-RPG employees. Simply put, Exhibit 161, which was created after the decision to amend the severance policies was made, does not establish that Harnischfeger is responsible for the

---

[9]However, in other contexts, Readinger (and Winkleman) did refer to Harnischfeger as the parent company. (Tr. at 331, 338, 387, 390)

policy changes.

Nor is there any evidence that Harnischfeger benefitted from Beloit's amendment of its severance policies. Harnischfeger, as Beloit's largest unsecured creditor, eventually gave up its multi-million dollar claim against Beloit, even after Beloit reduced its severance expenditures pursuant to the 1999 policies. (Tr. at 456) While, as the Court has already held above, Dangremond was acting (at least in material part) in his capacity as Harnischfeger officer when he communicated with Readinger about severance in October 1999, the absence of evidence that anyone else at Harnischfeger directed Dangremond to do so, and the absence of evidence of any benefit to Harnischfeger resulting from Dangremond's interference, undermine any contention that amendment of Beloit's severance policies was either a prime purpose or foreseeable result of the interference.

In the end, DWD simply has not proven that the "prime purpose" of Harnischfeger's communication to Beloit through Dangremond was to interfere with the Beloit employees' contractual rights to severance. Nor has DWD proven that Harnischfeger knew or should have known that it was substantially certain that Beloit would change its severance policies in response to Harnischfeger's communication to Beloit. Moreover, the specific result of the interference – the 1999 amendments, pursuant to which the substantial majority of downsized Beloit employees received essentially the same severance benefits they would have received under the 1996 severance policy – was the creation of Readinger and other Beloit personnel, and was entirely unforeseeable to Harnischfeger and the Committee. For all of these reasons, the Court concludes that DWD has failed to prove that Harnischfeger's interference was intentional.

### D.    Did Joy Global's Interference Cause Damages to DWD?

#### 1.    Causation

The next element of DWD's tortious interference claim is that Harnischfeger's

interference, in the form of Dangremond's communication to Readinger regarding severance,

caused Beloit to amend its severance policies.  Whether DWD has proved causation by a

preponderance of the evidence is a close call.  The Court concludes that DWD has met its

burden.

DWD contends that Harnischfeger's interference was a "substantial factor" in causing

Readinger to breach the 1996 severance policy agreements.  (D.I. 555-2 at 26)  This contention

rests heavily on Readinger's consistent and repeated testimony that he would not have

undertaken the effort to change Beloit's severance policies on his "own initiative," that is, absent

the call from Dangremond (or Currer).  (Tr. at 276, 336-38; Ex. 114 at 30-32)  Despite the costs

of paying severance under the 1996 policy, Readinger personally believed that Beloit should have

made such payments, both because it was Beloit's prior policy and "the right thing to do."  (Tr. at

338)  Readinger also testified that he acted "very quickly" after the initial conversation with

Dangremond, because he thought the Committee might otherwise shut down Beloit immediately.

(Tr. at 377)

DWD additionally contends that, aside from Readinger's testimony that he made the

"formal" decision to change the policies, the evidence shows that Beloit was "essentially a foot

soldier" in the amendment process.  (D.I. 559 at 4)  For example, Currer testified in his

deposition that, for business decisions made during the bankruptcy "above a certain level of

materiality, Harnischfeger called the shots," and that any "changes being proposed in contracts

that were material to the cash position of the corporation" would "often be run by the parent."
(Ex. 104 at 11)  Drafts of the amendments to the 1996 severance policies were circulated to
"unspecified" individuals at Harnischfeger, not to personnel at Beloit.  (Ex. 142 at 3)
Additionally, Beloit's November 18, 1999 announcement stating that Beloit would be divided
into six segments and "rescaled" was "coordinated" with Harnischfeger's substantially similar
press release issued the next day.  (Ex. 20; *see also* Tr. at 359-60)  PWC Managing Director
Sudhin Roy confirmed that "HII management" was responsible for this "structural realignment of
Beloit" as part of the effort to sell Beloit.  (Ex. 111-2 at 14, 26-27)  Further, the memorandum
that told Beloit employees of the severance policy changes was prepared in a format different
from Beloit's regular communications to its employees (Ex. 114 at 98-99, 100, 105, 107-10; Ex.
8; Ex. 20; Ex. 27; Ex.114-17; Ex. 114-20; Tr. at 91-92, 125, 136, 166-67, 318-19) and both the
policies and the memorandum were "drafted" by Kirkland & Ellis attorneys, not by Beloit
employees (Ex. 103-24 at A-37 to A-38; Ex. 103-29 at A-30; Ex. 142; Tr. at 460-63, 487-90).

In response, Joy argues that the severance policies were changed when Readinger
"reacted" to the message from the Committee that it was pushing back on severance costs; and,
hence, it was Beloit and not Harnischfeger which prompted the severance changes.  (D.I. 557 at
15)  Readinger "unequivocally" testified at trial that the decision to change the policy was his
own and no one from Harnischfeger told him to do it, and this testimony was corroborated by
Winkleman and Hanson.  (Tr. at 309-10, 409, 453)  Chokey also testified at trial that the
Committee – not Harnischfeger – was the entity pressuring Beloit about its severance
agreements, and that generally Beloit operated with a high level of corporate independence from
Harnischfeger.  (Tr. at 468-69, 471-72)

Additionally, Carol Ann Mohr, an employee of Harnischfeger for 21 years with responsibility for all the benefits administered by Harnischfeger, testified during her deposition that while Harnischfeger had some role in Beloit's employee benefits (i.e., Harnischfeger purchased the consolidated retirement plans entered into by its subsidiaries and managed related documents as needed), Harnischfeger "had no jurisdiction over [Beloit's severance] plan," which "was strictly handled at the Beloit Corporation level." (Ex. 112 at 11) Ross Altman, Beloit's General Counsel during the critical time, testified at his deposition that he never observed Harnischfeger controlling or directing Beloit's corporate decisions, either before or after the bankruptcy filing. (Ex. 101 at 8-9) Similarly, Jay Alix's Kenneth Hiltz testified at his deposition that no one at Harnischfeger had worked with Beloit on the November 1999 severance changes. (Ex. 110 at 31-32) In fact, it would have been very "unusual" for that to have happened because Harnischfeger's three subsidiary businesses "operated very autonomously in matters of their benefit plans and programs and really in a lot of other matters too." (*Id.*)

The Court finds that DWD is correct that Readinger would not have undertaken to change Beloit's severance policies if not for the call from Dangremond. However, the Court also finds that all that occurred with respect to and leading to the 1999 amendments to Beloit's severance policies was driven by Readinger and Beloit, not by Harnischfeger or the Committee. That is, Beloit was not merely a "foot soldier" in creating and implementing the amendments.

Whether, under the applicable Wisconsin legal standard, these facts render Harnischfeger's interference – that is, the communication by Dangremond or Currer to Readinger that the Committee wanted the 1996 severance policies changed – a "cause" of the severance policy changes presents a close question. The test is whether this interference was a "substantial

53

factor" leading to the policy amendments, and whether the interference had an "effect in producing harm so as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense." *Wolnak*, 287 Wis. 2d at 575-76 (internal quotation marks and citation omitted). The alleged cause must be more than just a preceding event.

The Court concludes that the October 1999 call from Dangremond to Readinger was a "substantial factor" in the amendment of Beloit's severance policies in November 1999. Primarily, this conclusion rests on Readinger's consistent testimony that he would not have considered modifying Beloit's severance policies in the absence of learning, through Dangremond or someone else at Jay Alix, that the Committee wished for Beloit to do so. This makes Dangremond's call a "cause" of the eventual policy amendments in the "popular sense" required by Wisconsin law.

### 2. Damages

#### a. General damages

DWD argues that Wisconsin law allows plaintiffs to recover general damages flowing from an intentional interference with contract, which in this case would be measured by the severance wages due to Beloit employees under the 1996 severance policy. (D.I. 555-2 at 28-29) DWD's calculation of these damages, while disputed on certain details, was not seriously challenged by Joy Global at trial. Instead, Joy Global argues that in order for the employees to be paid in full (as DWD demands), the severance obligations would have had to have been classified as an administrative expense. Yet, Joy Global continues, Third Circuit law prevents severance benefits from being paid entirely as an administrative expense over the objections of unsecured creditors (such as the Committee). (D.I. 557 at 30) Moreover, here the Third Circuit

has already affirmed this Court's determination that the amount of severance benefits entitled to be treated as an administrative expense is $490,525,36. (Ex. 63)

The Court finds that DWD has provided sufficient evidence from which a calculation of general damages would be possible and appropriate. As the Court noted in its January 21, 2010 Order, "the applicable measure of damages is the difference between what the parties would have gotten under the 1996 policy and what they actually received (that is, what they would have gotten but for the alleged interference)." (D.I. 537 at 2) Even though the former Beloit employees' claim would be an unsecured claim, and might not be collectable (in whole or in part), it is a claim that would – as Joy Global concedes – have a non-zero value. (*See* D.I. 557 at 30-31) Thus, DWD has adequately proven general damages, in an amount equal to the total severance benefits the 341 former Beloit employees would have received under Beloit's 1996 severance policy.

### b.   <u>Increased Wages</u>

DWD argues that increased wages of not more than 100% of the severance wages due to Beloit employees are also available here, pursuant to Wis. Stat. Ch. 109.11 (2009). (D.I. 555-2 at 29) DWD contends that the former employees are entitled to this additional payment because the underlying severance "wages" owed to them had not been paid in full at the time this action was commenced, and the ensuing additional ten years of delay are attributable to Joy Global. (*Id.*) In response, Joy Global maintains that Harnischfeger was not "the employer" of these former Beloit workers and, hence, cannot be liable for increased wages under the statute. (D.I. 557 at 36-37)

The Court has already considered Joy Global's argument in the context of its fifth motion for summary judgment, and there denied it based on untimeliness. (D.I. 511 at 12-14) Just as

55

Joy Global's position was untimely when raised for the first time in May 2009, it remains

untimely now (regardless of whatever merit that position may have). Therefore, if DWD had

proven all of the elements of its tortious interference claim, the Court would find that the former

Beloit employees were entitled to recover some amount of "increased wages."[10]

### c.  **Prejudgment Interest**

DWD contends that prejudgment interest should be awarded in this case because such

interest depends only on a "reasonably certain" standard of measurement. (D.I. 555-2 at 29)

Under Wisconsin law, a party must pay the aspects of damages that are reasonably certain, even

if other aspects are not. *See Jones v. Jenkins*, 88 Wis. 2d 712, 726-27 (Wis. 1979). DWD

contends that, based on Chiolino's investigation and calculations, the amount of severance wages

has been reasonably certain since May 2000, when Chiolino completed his spreadsheet listing the

terminated Beloit employees and their lengths of employment. (*Id.* at 30; Ex. 126-29) Joy

Global counters that Chiolino's methods were unreliable and indefinite, as exemplified by

Chiolino's inclusion until March 2001 of Laura Nigbur, a Beloit employee who was actually paid

severance. (D.I. 32-33) Additionally, DWD's claim for damages in this case has morphed from

"at least" $10 million to three other numbers, further demonstrating the unreliability of DWD's

quantification of its claim. (*Id.*)

The Court agrees with DWD that, if the evidence established Joy Global's liability for

interference, at least part of the amount of damages – i.e., severance wages owed to terminated

---

[10]Given the Court's overall disposition, it is not necessary to address what amount of
increased wages would be awarded. The Court does note, however, that it disagrees with
DWD's view that Joy Global is solely responsible for the delays experienced as part of this
lengthy litigation.

employees – was reasonably ascertainable by Joy Global at least as of March 2001 (and perhaps

earlier). Given that most of the information used to arrive at the total amount of severance wages

due came from Joy Global, Beloit, and/or Harnischfeger, the Court finds that Joy Global would

have had the means to accurately determine what severance amounts were owed to whom.

### E. Whether Joy Global's Alleged Interference was Privileged[11]

Joy Global contends that, even if DWD had proven by a preponderance of the evidence

that it was Dangremond who called Readinger, while acting as "Harnischfeger," and that

Dangremond and Harnischfeger intended Beloit to amend its 1996 severance policy agreement

and caused Beloit to do so, resulting in damage to Beloit employees, then Harnischfeger was

privileged to have acted as it did in advising Beloit of the Committee's desires with respect to

Beloit's severance policies. (D.I. 557 at 28) According to Joy Global, Wisconsin courts have

expressly recognized that majority stockholders, just like officers and directors, have a privilege

to tortiously interfere in the business of a corporation whose stock they own. *See Finch v.*

*Southside Lincoln-Mercury, Inc.*, 274 Wis. 2d 719, 749 (Wis. Ct. App. 2004) (noting officers and

directors are accorded this privilege in "the interest of freedom in exercising discretion to protect

the best interests of the corporation which they represent," and that "similar privilege is accorded

majority shareholders of a corporation") (internal quotation marks and citation omitted). Two

federal courts have also held that, under Wisconsin law, a parent company like Harnischfeger

incurs no liability for interfering with its subsidiary's relationship with a third party unless the

---

[11]To the extent Joy Global argues that it is protected from liability based on the truthful
information privilege, the Court finds that argument is untimely. As noted above, in May 2009,
the Court found that one of Joy Global's defenses, asserted for first time in January 2008, to be
too late; defenses asserted for the first time after trial are, under the circumstances of this case,
even more inappropriate. (D.I. 511 at 12-14)

parent used wrongful means. *See Allen & O'Hara v. Barrett*, 898 F.2d 512 (7th Cir. 1990); *Celite s.A. Industria e Comercio v. Sterling Plumbing Group, Inc.*, 80 F. Supp. 2d 1009 (E.D. Wis. 2000). In this case, Joy Global argues, Harnischfeger's undisputed 80% ownership of Beloit gave it a financial interest in Beloit's affairs and, hence, even if the weight of the evidence indicated that Joy Global was otherwise liable for tortious interference, financial privilege prevents a finding for DWD.

As a threshold matter, DWD disputes whether the financial interest privilege of the Restatement § 769 applies to this case. (D.I. 555-2 at 32-33) The text of § 769 creates a privilege for one with a financial interest who causes a person "not to enter into a prospective contract" with another. DWD argues that Wisconsin courts have respected this line between existing and prospective contracts and only accept privilege defenses in the context of prospective "or at-will contracts." (D.I. 555-2 at 32 (citing *Wolnak*, 287 Wis. 2d at 578-79; Restatement § 768 cmt. i; *Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 104 (Wis. Ct. App. 1979))) Because Beloit's 1996 severance contracts were binding, enforceable contracts, DWD urges the Court to analyze the propriety of Joy Global's interference "using the general factors of [Restatement] § 767, not the more limited factors of motive and means in § 769." (D.I. 555-2 at 33)

The factors set out in Restatement § 767 are:

> (a) the nature of the actor's conduct;
>
> (b) the actor's motive;
>
> (c) the interests of the other with which the actor's conduct interferes;

> (d) the interest sought to be advanced by the actor;
>
> (e) the social interests in protecting the freedom of action of the actor and the contractual interest of the other;
>
> (f) the proximity or remoteness of the actor's conduct to the interference; and
>
> (g) the relations between the parties.

Additionally, DWD argues that Harnischfeger's interference was illegal and, therefore, *per se* improper, and not privileged. (D.I. 555-2 at 33) On this point, DWD cites comment c to Restatement § 767, which states that:

> Conduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper. This may be true, for example, of conduct that is in violation of antitrust provisions or is in restraint of trade or of conduct that is in violation of statutes, regulations, or judicial or administrative holdings regarding labor relations.

DWD also relies on the Seventh Circuit's decision in *Stafford v. Puro*, 63 F.3d 1436 (7th Cir. 1995), as an example of the *per se* impropriety rule in a case brought by an employee for unpaid wages against owners of his employer-company. There, the owners asserted the financial interest privilege, but the court (citing § 767) held that the privilege was unavailable because the owners' conduct had violated the Illinois Wage Act. *See Stafford*, 63 F.3d at 1442.

Joy Global responds to DWD's "*per se* improper" argument by claiming that Harnischfeger did not utilize wrongful means in its alleged interference. Joy Global contends that, under Wisconsin law, "wrongful means" refers to the acts that caused the party to breach the contract at issue, not the breach of the contract itself. (D.I. 557 at 29) (citing *Pure Milk Prods. Coop v. Nat'l Farmers Org.*, 64 Wis. 2d 241 (1974) (identifying coercion by physical force or

59

fraudulent misrepresentation as examples of wrongful means))  There is no evidence in this case that Harnischfeger interfered using physical force or fraudulent misrepresentation or any similar wrongful means.  To Joy Global, DWD's argument is circular because its conclusion and premise are the same: it is wrongful means to violate the wage claim statute because violating the statute is illegal and, hence, wrongful.  (D.I. 557 at 29)

It is not necessary to decide the question of which Restatement section applies here.[12] Even under the Restatement standard preferred by DWD, Joy Global has proven by a preponderance of the evidence that it would have been privileged to interfere in the manner DWD claims it did.[13]

Here, the credible testimony and documentary evidence establish that Readinger and Winkleman created the two-tier severance package solution in response to their fear that, otherwise, the Committee might cut all severance to the legal minimum.  Readinger believed that in order to preserve whatever sales value was left in Beloit's few profitable business assets, he

---

[12]Although Restatement § 769 explicitly states that it only applies to *prospective* contractual relations, Illustration 2 seems to involve a factual scenario in which § 769's mode of analysis is applied to an *existing* contract.  Also, several Wisconsin federal and state courts have, applying Wisconsin law, repeatedly found § 769 to be the proper guide when the party accused of tortious interference has a financial interest in the party accused of breaching *an existing* contract. *See, e.g., Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 516 (7th Cir. 1990) (applying § 769 to existing contract where accused interferor had "financial interest" in party to contract); *Brabec v. Delmar Thomson Learning*, 2000 U.S. Dist. LEXIS 22572, at *39-41 (W.D. Wis. Dec. 20, 2000) (same); *Celite S.A. Industria e Comercio v. Sterling Plumbing Group, Inc.* 80 F. Supp. 2d 1009, 1011-12 (E.D. Wis. 2000) (same); *Richland Valley Prods., Inc. v. St. Paul Fire & Marine Ins. Co.*, 1995 U.S. Dist. LEXIS 22107, at *5 (W.D. Wis. Mar. 8, 1995) (same).

[13]This conclusion is, by necessity, limited to the particular circumstances presented here. *See* Commentary to Restatement § 767 ("[T]he determination of whether an interference is improper . . . under the particular circumstances [requires] . . . an evaluation of these factors for the precise facts of the case before the court; and, . . . it is usually not controlling in another factual situation.").

had to ensure that some Beloit employees would stay on after the restructuring. He accomplished this goal by offering select employees the better severance packages of Severance Policy #2. That Winkleman or others revised that group of select employees as business needs and realities shifted – while clearly a source of anxiety and resentment from the perspective of Beloit's workers – does not render Beloit's conduct or motives wrongful. To the contrary, the Court is persuaded that Readinger and others were motivated to retain and compensate (with severance) as many Beloit employees as possible, thereby preserving the value of Beloit's businesses and, simultaneously, doing what Readinger and Winkleman felt was "right" for the employees. All of these actions were taken in the context of the dire financial constraints in which Beloit found itself.

The Court has considered, as it is required to do under § 767, the crucially important interests of employees, and society, in wages, including severance benefits. The trial testimony of former Beloit employees Morris and Goldsworthy was moving. The Court is also sympathetic to the frustrations of the workers who have waited ten years for resolution of this case. Nonetheless, weighing all the factors that must be evaluated under § 767, the Court concludes that Harnischfeger was privileged to interfere in the Beloit severance contracts as it did.

Finally, the Court disagrees with DWD's contention that Joy Global's conduct was *per se* improper. The case relied upon by DWD to establish a *per se* impropriety rule when a defendant violates a wage statue, *Stafford v. Puro*, 63 F.3d at 1440, does not apply Wisconsin law. Instead, that case involved an Illinois statute that expressly allowed for tortious interference claims against a company's officers and directors. No Wisconsin state court or any district court applying Wisconsin law has ever cited *Stafford*. This Court lacks a basis to predict that the

61

Wisconsin Supreme Court, if faced with this issue, would create a *per se* impropriety rule when a defendant violates a wage statute and is accused of tortious interference. Furthermore, Harnischfeger was not the employer of the Beloit workers, and, hence, it is illogical to hold Harnischfeger *per se* liable for breaking a statute that governs the relationship between *employers* and their employees. *See* Wis. Stat. Ch. 109.

## CONCLUSION

At the conclusion of trial, counsel for Joy Global candidly described this as a "terribly unfortunate case." (Tr. at 517) The Court agrees with this assessment. In the end, however, DWD has failed to prove that there is anything that Wisconsin's law of tortious interference can do to remedy the misfortune suffered by the 341 former Beloit employees whose claims have now been thoroughly litigated for a decade.

For the reasons set forth above, the Court finds that DWD has failed to prove that Harnischfeger tortiously interfered with the former Beloit employees' contractual rights to severance benefits. Even if Harnischfeger had tortiously interfered, it would have been privileged to do so – and, therefore, not legally liable for its conduct. Accordingly, judgment will be entered for Joy Global. An appropriate Order shall be issued.