## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:  JOY GLOBAL, INC. f/k/a
Harnischfeger Industries, Inc. 99-2171 (PJW)

JOY GLOBAL, INC. f/k/a
Harnischfeger Industries, Inc.,
                         Plaintiff,

v.                                                          Case No. 01-39 LPS

WISCONSIN DEPARTMENT OF
WORKFORCE DEVELOPMENT,
                         Defendant.

---

BRIEF SUPPORTING MOTION OF DEFENDANT, WISCONSIN DEPARTMENT OF
WORKFORCE DEVELOPMENT TO AMEND OR ADD TO FACTUAL FINDINGS, TO
ALTER OR ADD TO LEGAL CONCLUSIONS AND TO ALTER OR AMEND THE
JUDGMENT PURSUANT TO FED.R.CIV.P. 52(b) AND 59(e)

---

Stuart B. Drowos (DE Bar # 427)*          J. B. Van Hollen, Attorney General
Deputy Attorney General                    Richard Briles Moriarty (WI Bar # 1017190)*
Division of Revenue                         Charlotte Gibson (WI Bar # 1103755)*
Delaware Department of Finance             Assistant Attorneys General
Carvel State Building                       Wisconsin Department of Justice
820 N. French Street, 8th Floor            Post Office Box 7857
Wilmington, Delaware 19801                 Madison, Wisconsin 53707-7857
(302) 577-8660                             (608) 267-2796 (Moriarty)
                                           (608) 266-7656 (Gibson)

*Counsel of Record

TABLE OF CONTENTS

Page

ISSUES PRESENTED.............................................................................................. 1

ARGUMENT ......................................................................................................... 2

    I.      Objections were not waived regarding Hiltz
           deposition excerpts relied on by the court and,
           regardless, that reliance was plain error................................................... 2

    II.     The court should amend or add to its findings....................................... 5

    III.    The court should alter or amend conclusions about
           the scope of the interference. ................................................................. 7

    IV.    The court should alter or amend conclusions about
           proof of the intent element. ................................................................... 8

    V.     The court should alter or amend conclusions about
           proof of the financial interest privilege................................................ 17

    VI.    The court should alter or amend its Judgment, after
           determining the appropriate amount of increased wages,
           by entering Judgment in favor of the Department and
           against Joy Global, based on the damages already
           determined by the court together with an appropriate
           amount of increased wages. .................................................................. 19

CONCLUSION .................................................................................................... 20

## TABLE OF AUTHORITIES

### Cases

ANR Western Coal Development Co. v. Basin Elec. Power Co-op.,
    276 F.3d 957 (8th Cir. 2002) ............................................................... 13, 14

Bank of New York v. Fremont General Corp.,
    523 F.3d 902 (9th Cir. 2008) ............................................................... 11-13

Briesemeister v. Lehner,
    2006 WI App 140, 295 Wis. 2d 429, 720 N.W.2d 531 .................................. 8, 9

Culcal Stylco v. Vornado, Inc.
    (1972) 26 Cal.App.3d 879, 103 Cal. Rptr. 419 (1972)..................................... 18

Dorr v. Sacred Heart Hosp.,
    228 Wis. 2d 425, 597 N.W.2d 462 (Ct.App. 1999),
    review dismissed, 230 Wis. 2d 276, 604 N.W.2d 574 (1999)............................ 9

Fontenot v. Mesa Petroleum Co.,
    791 F.2d 1207 (5th Cir. 1986) ................................................................. 5

Foseid v. State Bank of Cross Plains,
    197 Wis. 2d 772, 541 N.W.2d 203
    (Ct.App. 1995), review denied .................................................................. 9

Gianacopoulos v. MOS Design, Inc.,
    2008 WL 1774094 (M.D.Pa. April 16, 2008)
    (No. CIV.A. 3:05-2417) ......................................................................... 15

Haessly v. Germantown Mut. Ins. Co.,
    213 Wis. 2d 108, 569 N.W.2d 804 (Ct.App. 1997),
    review denied, 215 Wis.2d 425, 576 N.W.2d 281 (1997).......................... 10, 11

Hartridge v. State Farm Mut. Auto. Ins. Co.,
    86 Wis. 2d 1, 271 N.W.2d 598 (1978) ....................................................... 7

Hoey Outdoor Advertising, Inc. v. Ricci,
    2002 WI App 231, 256 Wis. 2d 347, 653 N.W.2d 763 .................................. 17

In re Creative Goldsmiths of Washington, D.C.,
    178 B.R. 87 (Bankr.D.Md. 1995) .............................................................. 6

Kargo, Inc. v. Pegaso PCS, S.A. de C.V.,
   2008 WL 2930546 (S.D.N.Y. July 29, 2008)
   (No. 05CIV.10528(CSHDFE) ................................................................... 18

Kollsman, a Div. of Sequa Corp. v. Cohen,
   996 F.2d 702 (4th Cir. 1993) ..................................................................... 2

Maryland Jockey Club v. ODS Technologies, L.P.,
   2005 WL 1200181 (D.Md. May 20, 2005)
   (No. CIV. WMN-03-2124) ........................................................................ 16

Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros,
   176 F.3d 669 (3rd Cir. 1999) ..................................................................... 6

Mendelson v. Blatz Brewing Co.,
   9 Wis. 2d 487, 101 N.W.2d 805 (1960) ..................................................... 17

National Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.,
   899 F.2d 119 (1st Cir. 1990) ........................................................... 5, 6, 20

Pachucki v. Republic Ins. Co.,
   89 Wis. 2d 703, 278 N.W.2d 898 (1979) .............................................. 9, 10

Pediatrix Screening, Inc. v. Telechem Intern., Inc.,
   602 F.3d 541 (3rd Cir. 2010) ..................................................................... 19

Select Creations, Inc. v. Paliafito America, Inc.,
   911 F.Supp. 1130 (E.D.Wis. 1995) ........................................................... 18

State v. Gould,
   56 Wis.2d 808, 202 N.W.2d 903 (1973) ................................................... 10

Stucchi USA, Inc. v. Hyquip, Inc.,
   2010 WL 2990966 (E.D.Wis. July 28, 2010)
   (No. 09-CV-732) ........................................................................................ 9

U. S. Gypsum Co. v. Schiavo Bros., Inc.,
   668 F.2d 172 (3rd Cir. 1981),
   cert. denied, 456 U.S. 961 (1982) ...................................................... 6, 20

Vinas v. Chubb Corp.,
   499 F.Supp.2d 427 (S.D.N.Y. 2007) ......................................................... 18

Wangard Partners, Inc. v. Graf,
   2006 WI App 115, 294 Wis. 2d 507, 719 N.W.2d 523 .............................. 7

Wardlaw v. Inland Container Corp.,
    76 F.3d 1372 (5th Cir. 1996),
    reh, denied 84 F.3d 435 (5th Cir. 1996) ...................................................................... 14, 15

Wolf v. F & M Banks,
    93 Wis. 2d 439, 534 N.W.2d 877 (Ct.App. 1995).......................................................... 17

Wolnak v. Cardiovascular & Thoracic Surgeons,
    2005 WI App 217, 287 Wis. 2d 560, 706 N.W.2d 667 .................................................... 17

Rules

Fed.R.Civ.P. 46 ....................................................................................................................... 2

Fed.R.Civ.P. 52(b) ........................................................................................................... 1, 6, 20

Fed.R.Civ.P. 59(e) ........................................................................................................... 1, 6, 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE:  JOY GLOBAL, INC. f/k/a
Harnischfeger Industries, Inc. 99-2171 (PJW)

JOY GLOBAL, INC. f/k/a
Harnischfeger Industries, Inc.,
                    Plaintiff,
v.                                                                Case No. 01-39 LPS

WISCONSIN DEPARTMENT OF
WORKFORCE DEVELOPMENT,
                    Defendant.

BRIEF SUPPORTING MOTION OF DEFENDANT, WISCONSIN DEPARTMENT OF
WORKFORCE DEVELOPMENT TO AMEND OR ADD TO FACTUAL FINDINGS, TO
ALTER OR ADD TO LEGAL CONCLUSIONS AND TO ALTER OR AMEND THE
JUDGMENT PURSUANT TO FED.R.CIV.P. 52(b) AND 59(e)

Defendant, Wisconsin Department of Workforce Development (the Department),

supports its Motion to amend or add Factual Findings, alter or add to Legal Conclusions and alter

or amend the Judgment.  (D.I. 524.)  While the Department must focus on manifest errors of fact

and law and, therefore, be critical of the court, it notes that the court correctly resolved many

complex factual and legal issues in ways solidly based on the record and the applicable law.   The

Opinion is a potentially excellent product in need of a rewrite – and a new ending.  The record

and applicable law compel that result.  Fed.R.Civ.P. 52(b) or 59(e).

ISSUES PRESENTED

1.        Were objections waived regarding Hiltz deposition excerpts relied on by the court

and, regardless, was that reliance plain error?

2.        Should the court amend or add to its findings?

3.      Should the court alter or amend conclusions about the scope of the interference?

4.      Should the court alter or amend conclusions about proof of the intent element?

5.      Should the court alter or amend conclusions about proof of the financial interest privilege defense?

6.      Should the court alter or amend its Judgment, after determining the appropriate amount of increased wages, by entering Judgment in favor of the Department and against Joy Global, based on the damages already determined by the court together with an appropriate amount of increased wages?

## ARGUMENT

I.      OBJECTIONS WERE NOT WAIVED REGARDING HILTZ
        DEPOSITION EXCERPTS RELIED ON BY THE COURT AND,
        REGARDLESS, THAT RELIANCE WAS PLAIN ERROR.

The court concluded that the Department waived all evidentiary objections by not separately presenting argument in its post-trial briefs, with cited authority, to support each of hundreds of objections it had properly asserted.  (D.I. 563, pp. 2-4.)  That conclusion was grounded on multiple abuses of discretion that allowed those objections to accumulate and on manifest errors of law and fact.  This is now important because the court relied on Hiltz deposition excerpts designated by Joy Global to which the Department properly asserted, and later preserved, objections.  To preserve an evidentiary objection, a party need only timely assert it and sufficiently identify its basis to allow the court to ascertain its grounds.  *E.g., Kollsman, a Div. of Sequa Corp. v. Cohen*, 996 F.2d 702, 707-08 (4th Cir. 1993); Fed.R.Civ.P. 46.

The Scheduling Order required each party to identify in the Final Pre-Trial Report objections to exhibits, and to deposition and prior trial excerpts, proposed by the other party.

(D.I. 292, pp. 3-4.)  The Department fully complied.  (D.I. 523-3, D.I. 523-7 & 523-9.)  Rather than resolve objections to exhibits and deposition excerpts at the Final Pretrial Conference, the court unexpectedly deferred resolution of all objections.  Then, rather than resolve those objections during trial, the court unexpectedly admitted all exhibits and deposition excerpts subject to each party stating, in its post-trial briefs, the extent to which it stood on objections previously properly identified in the Joint Final Pretrial Report.  During trial, objections to trial testimony also accumulated and remained unresolved.  In its Opinion, after allowing a mountain of objections to accumulate and rejecting the Department's post-trial suggestion of an objection chart, the court unexpectedly deemed the Department to have waived any objection not expressly and specifically supported with legal authority in its post-trial briefs. This abused the court's discretion and constituted manifest errors of law and fact.

Concluding that, to avoid waiver, the Department had to go well beyond the standard requirements of federal evidence law and practice by making, in its page-limited post-trial briefs, detailed legal arguments keyed to each individual objection, was a manifest error of law grounded on a series of prior abuses of discretion.  The Department's properly asserted objections were preserved through the post-trial briefing.  Unaware of what evidence Joy Global would cite in its response materials, the Department reiterated that it preserved **all** prior evidentiary objections while preemptively including legal arguments, with authority, supporting its objections to Joy Global's designations of  favorable deposition testimony by its own officers.  (D.I. 555-2, pp. 30-31.)  Since the responsive materials did cite that type of testimony, the Department, limited to a 15 page reply that also had to address Joy Global's privilege defense, presented focused, though necessarily short, arguments on those issues.  (D.I. 559, p. 11.)

The Department did not waive objections to the challenged Hiltz deposition testimony, but, if it had, it was plain error to rely on that testimony.  (D.I. 563, pp. 20, 46, n.6 and 53.) Turning Hiltz testimony into findings - that all of Harnischfeger's subsidiaries "operated very autonomously" and that Hiltz was unaware of anyone at Harnischfeger working with Beloit on severance issues or instructing Beloit to "'dump'" severance - was plain error in light of the record trial evidence and other Factual Findings by the court that were properly grounded on record evidence. (D.I. 563, p. 20.)  In its legal analysis, the court also twice relied on this challenged Hiltz deposition testimony to make similar statements.  (D.I. 563, pp. 46, n.6 and 53.)

Beloit did not operate "very autonomously."  Readinger viewed Hanson as his "supervisor" and "boss" (Ex. 114, pp. 20-21 (Readinger depo., 33/25 to 34/12), a view shared by others (Ex. 105, 92/11-14).  When Hanson asked him to become Beloit President, his "first reaction was, you know, who did [I] upset" to get moved into that position and he viewed his first day in the position as a "date that will live in infamy" (B-268/2-25 & B-271/12-15) – an understandable reaction since Hanson fired Readinger's predecessor.  (B-443/25 to B-444/17.) Hanson, as Harnischfeger, "put" Readinger in the position because, in his view, Readinger "understood the strategic direction that **I** wanted to **drive** all three of these businesses, …" (B-443/25 to B-444/17, emphasis added).  Hanson was in control and Readinger knew his continued employment depended on complying with that reality.  (*Id.*)  Harnischfeger decided that Beloit would file for bankruptcy, planning extensively for those filings while keeping Beloit officials including Readinger in the dark until they were instructed what to do, and a Harnischfeger officer – not a Beloit official - signed Beloit's separate bankruptcy petition (FF 32). Readinger went to Hanson to obtain authorization or approval of those alternatives to eliminating severance. (FF 56.)  PWCS Managing Director Sudhin Roy confirmed that "HII

management" was responsible for the "structural realignment of Beloit" in November 1999 as part of the sale.  (FF 76.)  Beloit was far from autonomous.

Restricted to the Factual Findings, Hiltz was also "aware" of people at Harnischfeger "working with Beloit on severance issues" since, Dangremond and Hiltz, as top Harnischfeger officers, were deeply involved in ongoing interactions with Beloit on those severance issues when Harnischfeger, through Dangremond, was interfering with the severance contracts.  (FF 46, 47 and 50.)  Going beyond those Findings, Readinger, while developing alternatives, interacted with Dangremond about what those alternatives should be. (Ex. 114, pp. 49-51 (Readinger depo., 83/21 to 85/9, 85/18 to 86/6 & 86/81-5.)  Relying on these excerpts was plain error.

## II.     THE COURT SHOULD AMEND OR ADD TO ITS FINDINGS.

"The purpose of motions to amend" under Rule 52(b) "is to correct manifest errors of law or fact" and "a party may move to amend the findings of fact even if the modified or additional findings in effect reverse the judgment."  *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986).  The Rule's "purpose is to permit the correction of any manifest errors of law or fact that are discovered, upon reconsideration, by the trial court."  *National Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.*, 899 F.2d 119, 123 (1st Cir. 1990).

"Manifest error" in this setting is **not** equivalent to the "clearly erroneous" standard used by appellate courts, which is driven by deference to the trial court.  *Id.*, 899 F.2d at 124.  Indeed, the "policy considerations" that govern appellate review actually support a generous view of the scope of "manifest error" during "a trial court's reconsideration of its own factual findings pursuant to a Rule 52(b) or 59(e) motion."  *Id.*, 899 F.2d at 124-25.  A "trial judge who is reviewing her own findings for manifest error pursuant to Rule 52(b) or 59(e) *was* present at the trial to view the evidence and the witnesses firsthand" and this "vantage point eliminates the

need to impose the stringent burdens of the appellate clearly erroneous standard on a trial court that is reviewing its own findings for error." *Id.*, 899 F.2d at 125. italics in original.

"Factual determinations are correctable under Rule 52(b) if the district judge who heard the evidence believes that they are necessary, and capable of being made without the grant of a new trial." *U. S. Gypsum Co. v. Schiavo Bros., Inc.*, 668 F.2d 172, 180, n.9 (3rd Cir. 1981), cert. denied, 456 U.S. 961 (1982). Rule 52(b) and 59(e) are "appropriate means of bringing to the court's attention manifest errors of fact or law." *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 678 (3rd Cir. 1999). The Third Circuit, in *Max's Seafood Café*, reversed and remanded because the district court should have addressed and corrected manifest errors and because, once they were corrected, the proper ultimate result was different. 176 F.3d at 678-79. "Thus, a court, under this rule, may amend, amplify or expand upon its initial findings even to the extent that the modified or additional findings in effect reverse the initial ruling." *In re Creative Goldsmiths of Washington, D.C.*, 178 B.R. 87, 91 (Bankr.D.Md. 1995).

The Department, seeking amendments and additions to the Findings (D.I. 565 (Post-Judgment Motion, ¶¶ 21-39 (seeking amendments or additions to FF 29, 30, 38, 40, 48, 52, 55, 57, 63, 66, 67, 71, 72, 73, 74, 77, 83 and 91))), restricts itself to ones falling well within the confines of Rule 52(b). If the court concludes that, restricted to the current Factual Findings, the Judgment cannot be amended to one favoring the Department, correcting manifest errors of fact is required by Rule 52(b) and 59(e). The court could, however, enter judgment for the Department without altering any Factual Finding merely by correcting manifest errors of law regarding the intent element and the financial interest privilege defense (D.I. 565 (Post-Judgment Motion, ¶¶ 3-19) although, in that event, the court should still correct manifest errors of fact to assure that any appeal is built on a solid factual foundation.

III.     THE COURT SHOULD ALTER OR AMEND CONCLUSIONS ABOUT
         THE SCOPE OF THE INTERFERENCE.

The court correctly determined that Harnischfeger interfered through interactions between

Dangremond, as its Chief Restructuring Officer, and Readinger, as Beloit's President.  (D.I. 563,

pp. 40-44.)  But it erroneously determined that this interference was restricted to Dangremond

telling Readinger that the Creditor's Committee wanted Beloit to eliminate severance.  (*Id.*)

Under governing law, Harnischfeger instead engaged in a series of actions that, individually and

combined, constituted multiple interference actions.  *Wangard Partners, Inc. v. Graf*, 2006 WI

App 115, 294 Wis. 2d 507, 719 N.W.2d 523, finding that a complaint alleged the interference

element (and all other elements of an interference claim) against Steinhafels, noted allegations

that the Grafs breached a contract with Wangard and that Steinhafels engaged in several acts that

"encouraged this breach."   2006 WI App 115 at ¶ 37, 294 Wis. 2d at 527-28, 719 N.W.2d at

533.  Intent and cause are evaluated separately from what constitutes interference and the

threshold for proving interference is low.  *Id.*; *Hartridge v. State Farm Mut. Auto. Ins. Co.*, 86

Wis. 2d 1, 12-13, 271 N.W.2d 598, 603 (1978).  Harnischfeger's interference, analyzed

separately from its intent, was far broader than the initial contact, since it engaged in at least one

other act of interference, i.e., later telling Beloit that the Committee had approved an alternative

plan.  (FF 56.)  The court correctly found that the 1996 policy would have remained in place had

Harnischfeger not told Beloit that the Committee wanted the severance contracts eliminated.  Its

Factual Findings also compel the conclusion that Harnischfeger telling Beloit that the Committee

approved ending those contracts through that alternative was critical to ending the 1996 policy.

Other actions by Harnischfeger made its interference ongoing and more significant than

just that initial contact.  Readinger, while developing alternatives, had several conversations with

Dangremond (and perhaps contacts through e-mail), about "what we needed to do to convince the creditor's committee that their desire of having nothing more than bare minimum severance was the wrong policy and that to do something different from that maintained greater value in the whole entity and then, therefore, they would benefit more at the end and how to do that and how to structure the arguments for that." (Ex. 114, pp. 49-51 (Readinger depo., 83/21 to 85/9, 85/18 to 86/6 & 86/81-5.)  Harnischfeger also advised Beloit that Readinger did not need to obtain Board approval for severance contract changes while analyzing those alternatives. (Ex. 114, pp. 49-51 (Readinger depo., 83/21 to 85/9, 85/18 to 86/6 & 86/81-5.)

As a result, although that initial contact sufficed to satisfy the interference element, Harnischfeger's interference **began** with that initial contact and continued on an ongoing basis as (1) Dangremond and Readinger discussed alternatives that the Committee – purportedly wanted severance eliminated – would find acceptable, (2) Dangremond advised Readinger he did not need to obtain Board approval, and (3) Dangremond told Readinger that the Committee had approved the very severance policy changes that were ultimately issued.  The initial contact was the start of Harnischfeger's ongoing involvement with severance policy changes through which it sent repeated messages that the policy had to be changed.  (FF 46, 47 and 50.)

IV.    THE COURT SHOULD ALTER OR AMEND CONCLUSIONS ABOUT PROOF OF THE INTENT ELEMENT.

Under applicable law, the intent element may be proven through two alternate methods, one involving "prime purpose" and the other involving predictability.  The court relies on *Briesemeister v. Lehner*, 2006 WI App 140, 295 Wis. 2d 429, 720 N.W.2d 531.[1]  Although

---

[1]Joy Global, in its sur-reply, cited the applicable Wisconsin jury instruction and, as the court observed, *Briesemeister* also cited that jury instruction.  The instruction is not generally available online so the Department, for the court's convenience, provides a copy with this brief. (Ex. 1.)

*Briesemeister* confirmed these two alternate methods, it did not, given its finding that the purpose method was unquestionably satisfied, otherwise mention the predictability method.  2006 WI App 140 at ¶¶ 49-50, 295 Wis. 2d at 453-54, 720 N.W.2d at 542-43.  By contrast, *Stucchi USA, Inc. v. Hyquip, Inc.*, 2010 WL 2990966 (E.D.Wis. July 28, 2010) (No. 09-CV-732), citing *Briesemeister*, held that allegations of an interference with contract claim did not make it plausible that interference was the prime purpose but went on to allow the claim to proceed because "certainly Hyquip has alleged facts that, if true, would make it plausible that defendants 'knew or should have known' that" interference would occur.  2010 WL 2990966 at *5.

If the interferer "knew that the interference was 'certain, or substantially certain, to occur," then the requirement that the interferer "must act with a purpose to interfere with the contract" is satisfied. *Dorr v. Sacred Heart Hosp.*, 228 Wis. 2d 425, 458, 597 N.W.2d 462, 479 (Ct.App. 1999), review dismissed, 230 Wis. 2d 276, 604 N.W.2d 574 (1999).  "Purpose" under the second method of proving intent means that the interferer "'acted in such a fashion and for such purpose that he knew that the interference was 'certain, or substantially certain, to occur'" (*Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 790, n. 11, 541 N.W.2d 203, 209, n.11 (Ct.App. 1995), review denied), not – as under the first method – that the plaintiff must prove that the conscious purpose of the interferer was to interfere.

This distinction was noted in *Pachucki v. Republic Ins. Co.*, 89 Wis. 2d 703, 278 N.W.2d 898 (1979), in the context of a different tort and an intentional tort exclusion in an insurance policy, where Pachucki sustained a serious injury to his eye and a worker (Boeschke) "intended" to cause him bodily injury.  89 Wis. 2d at 709-14, 278 N.W.2d at 901-04.  Boeschke and other workers, entering a room where Pachucki was working, started a "greening pin war" - "comparable to the shooting of paper clips with rubber bands" and a "game" that Pachucki had

previously played.  89 Wis. 2d at 704-07, 278 N.W.2d at 899-900.  As a factual matter, Boeschke

intended to hit Pachucki somewhere on his body with a "greening pin" as part of that "game" but

not to cause any permanent harm to Pachucki, much less cause harm to his eye.  89 Wis. 2d at

709-14, 278 N.W.2d at 901-04.  Boeschke knew, however, that it is difficult to control the aim of

those "greening pins" such that, under the predictability method of proving intent, he legally

"intended" the bodily injury that occurred to Pachucki's eye.  89 Wis. 2d at 709-14, 278 N.W.2d

at 901-04.  The *Paculcki* Court quoted, and relied on, these comments from *Prosser on Torts*:

> "The intent with which tort liability is concerned is not necessarily a hostile
> intent, or a desire to do any harm.  Rather it is an intent to bring about a result which will
> invade the interests of another in a way that the law will not sanction. The defendant may
> be liable although he has meant nothing more than a good-natured practical joke, . . .
> "Intent, however, is broader than a desire to bring about physical results. It must
> extend not only to those consequences which are desired, but also to those which the
> actor believes are substantially certain to follow from what he does. . . . The man who
> fires a bullet into a dense crowd may fervently pray that he will hit no one, but since he
> must believe and know that he cannot avoid doing so, he intends it. The practical
> application of this principle has meant that where a reasonable man in the defendant's
> position would believe that a particular result was substantially certain to follow, he will
> be dealt with by the jury, or even by the court, as though he had intended it. . . .

89 Wis. 2d at 711, 278 N.W.2d at 902, quoting Prosser, Law of Torts, 4th ed. (1971).

It does not matter, in this inquiry, why Harnischfeger interfered.  Had Harnischfeger

presented evidence that Dangremond, when interfering, had no actual desire to cause any harm

and was "fervently praying" that no Beloit workers would have their severance contracts

changed, the Department would have satisfied the intent element, simply because it was certain

or reasonably certain that those contracts would be changed in some way based on that

interference.  *E.g.*, *Pachucki*, 89 Wis. 2d at 709-14, 278 N.W.2d at 901-04.  *Haessly v.*

*Germantown Mut. Ins. Co.*, 213 Wis. 2d 108, 569 N.W.2d 804 (Ct.App. 1997), review denied,

215 Wis.2d 425, 576 N.W.2d 281 (1997) summarized the *Pachucki* message:

> The man who fires a bullet into a dense crowd may fervently pray that he
> will hit no one, but since he must believe and know that he cannot avoid
> doing so, he intends it.

*Pachucki*, 89 Wis.2d at 711, 278 N.W.2d at 902 (emphasis added) (quoted source
omitted).  It is also well established that a person is presumed to intend "the natural and
probable consequences of his acts voluntarily and knowingly performed."  *State v.
Gould*, 56 Wis.2d 808, 814, 202 N.W.2d 903, 906-07 (1973).

213 Wis. 2d at 118, 569 N.W.2d at 808.

Proving intent by the predictability method does not require surmounting the hurdles

perceived by the court here.  The Ninth Circuit confirmed that passive **failure** by a corporate

officer to act can prove intent to interfere, through the predictability method, even when the

interference occurred only because the plaintiff itself took unauthorized actions.  *Bank of New

York v. Fremont General Corp.*, 523 F.3d 902, 905-11 (9th Cir. 2008), *en banc*.  Fremont

General was "the ultimate corporate parent of Fremont Indemnity" (523 F.3d at 905), which was

required, in providing workers' compensation policies to New York employers, to (1) maintain

custodial accounts at a New York bank in trust, (2) enter into a "custodian agreement" with Bank

of New York (BONY) and (3) avoid withdrawing principal from those custodial accounts.  523

F.3d 905-06.  Fremont General "managed Fremont Indemnity's investments pursuant to a written

Services and Management Agreement" and, acting as its "investment manager," deposited

interest-bearing securities in the custodial accounts.  523 F.3d at 906.  Fremont General obtained

approval from the New York Insurance Department to substitute GNMA securities for those

interest-bearing securities, although GNMA securities made periodic principal payments,

"contingent on a commitment by Fremont Indemnity" to "'replace any GNMA or GNMA CMO

security on deposit before any return of principal is made.'"  523 F.3d at 906.  BONY, from May

2002 to April 2003 and following Fremont General's instructions, transferred moneys from the

custodial accounts to another account, which resulted in principal reductions in the custodial

accounts. 523 F.3d at 907.  Until October 2002, transfers were made pursuant to a Fremont

General standing order and, from then until April 2003, were made pursuant to monthly letters

that, as BONY required, specified the amounts Fremont General wanted transferred.  523 F.3d at

907.  The first two monthly letters used Fremont General letterheads, while the remaining

monthly letters used Fremont Indemnity letterheads.  523 F.3d at 907, n.4 & 911.

Fremont Indemnity's financial condition deteriorated throughout this period and, after the

last April 2003 transfer occurred, it was placed in conservatorship in California and thereafter

liquidated.  523 F.3d at 907.  Responding to the conservatorship proceeding, New York

authorities sought an accounting from BONY regarding the custodial accounts, which confirmed

that about $14 million in principal was removed from the accounts and not replaced.  523 F.3d at

907-08.  BONY settled with those authorities to replace that principal amount together with

interest (523 F.3d at 908-09) and then sued Fremont General for interfering with its contractual

relations with Fremont Indemnity (523 F.3d at 905).  Fremont General was granted summary

judgment on BONY's interference claim because the district court found BONY could not prove

causation because it was independently obliged to obtain permission from New York authorities

before making transfers that reduced principal in the custodial accounts and it knew, from May

2002 forward, that the transfers were improperly reducing principal.  523 F.3d at 909-10 &

914-15.  The appellate court, after determining that BONY could prove causation (523 F.3d at

909-11), turned to intent and, finding "no direct evidence of Fremont General's intention" such

that the intent inquiry turned on "whether there is evidence from which a finder of fact could

reasonably infer its intention, or evidence that Fremont General conducted itself in a manner

substantially certain to interfere with the contract."  523 F.3d at 911.  It sufficed, to survive

summary judgment, that, by November 2002, David Brody, an Assistant General Counsel at

Fremont General, knew that it "was causing the transfer of principal from the custodial account," there was "evidence from which the finder of fact could reasonably deduce that [Brody] knew the transfer of principal violated the terms of the custodian agreement" and, although "Brody did not personally cause the transfers, a jury could find that he knew about them and effectively sanctioned them **by failing to stop them from occurring**."  523 F.3d at 911, emphasis added.

"Brody's knowledge and conduct must be imputed to Fremont General" and "a reasonable finder of fact could conclude that Fremont General through Brody caused the transfer of principle with the intention of disrupting the contract at issue."  523 F.3d at 911.  Although these intent holdings were bolstered by Fremont General changing its letterhead practice (523 F.3d at 907, n.4 & 911), it was the passive failure by Fremont General (through Brody) to prevent further transfers that satisfied the intent element.  523 F.3d at 911.  Summary judgment for Fremont General on the interference claim was reversed and that claim was allowed to proceed (523 F.3d at 911), although BONY had the independent duty noted above and knew, from May 2002 forward, that the transfers were improperly reducing principal.  523 F.3d at 909-10 & 914-15.

Motive and purpose are never part of the intent analysis – even when plaintiffs must prove the absence of justification or privilege.  In *ANR Western Coal Development Co. v. Basin Elec. Power Co-op.*, 276 F.3d 957 (8th Cir. 2002), WCDC counterclaimed against Basin and Dakota Coal for intentionally interfering with a royalty contract between WCDC and Coteau. 276 F.3d at 959-60, 963 & 971-73.  The Magistrate Judge evaluated the claim under North Dakota law where, unlike in Wisconsin, a plaintiff must prove absence of justification or privilege.  276 F.3d at 971.  The Magistrate Judge found the contract existed, that Coteau breached it by using a deeming accounting method and that Basin and Dakota Coal caused the breach by prompting Coteau to use that method.  276 F.3d at 971-73.  She denied the claim, however, by "analyz[ing]

justification and intent together," by "discussing the facts as presenting a justification that negates any ill intent on the part of" Basin and Dakota Coal, and by concluding that Basin and Dakota Coal were not motivated by a desire to "'cheat" WCDC out of the royalty it was due.'" 276 F.3d at 971-72. The Eighth Circuit, holding as a matter of law that plaintiff had proven all elements of its intentional interference claim, reversed and remanded for consideration of damages issues. 276 F.3d at 972-73. The "motive and purpose" of Basin and Dakota Coal were immaterial because North Dakota had adopted "comment j to section 766 of the Restatement" under which "even if an actor has a legitimate motive or purpose for its actions, if the actor has knowledge of the consequences of its acts, then it may be liable for tortious interference with contract." 276 F.3d at 972. Since Basin and Dakota Coal "had the requisite knowledge of the inevitable effect of the deeming accounting method - that it would undercut WCDC's position in relation to its royalty agreement with Coteau regarding the royalty-bearing reserves," that was "enough, under North Dakota law, to establish tortious interference as a matter of law." 276 F.3d at 972. It was error "as a matter of law" to reject the interference claim based on the conclusion that "Basin and Dakota Coal did not act with the purpose and intent of interfering with WCDC's contractual right to royalty payments when they directed Coteau to implement the deeming accounting method." 276 F.3d at 972-73.

Proving that the interferer had another purpose is immaterial under the predictability method inquiry. In *Wardlaw v. Inland Container Corp.*, 76 F.3d 1372 (5th Cir. 1996), reh, denied, 84 F.3d 435 (5th Cir. 1996), Wardlaw sued Anheuser for interfering with his employment contract with Inland. 76 F.3d at 1374-75. Wardlaw, seeking to become a consultant for Stone (a competitor of Inland), disclosed "information about the volume of products that Anheuser bought from Inland and the amount of revenues the account was generating" and

suggested that Stone contact Anheuser "to confirm that Wardlaw's efforts had fostered Inland's

growth." 76 F.3d at 1374.  Stone contacted Anheuser, which asked it to fax Wardlaw's letter,

from which Anheuser concluded that Wardlaw had disclosed confidential information.  76 F.3d

at 1374.  Anheuser called Inland expressing concerns about these disclosures without asking

"that any action be taken against Wardlaw or that the letter be reported to Wardlaw's

supervisors."  76 F.3d at 1374.  Inland fired Wardlaw "for violating Inland's Anti-Trust

Compliance Policy and for offering to use customer contacts he had acquired at Inland to

influence major customers to conduct business with Stone."  76 F.3d at 1374-75.  Wardlaw

settled claims against Inland and a jury found in his favor on his interference claim against

Anheuser. 76 F.3d at 1375.  On appeal, Anheuser asserted that Wardlaw failed to prove intent

because its sole purpose was to prevent future dissemination of the confidential information, but

the Fifth Circuit held that Wardlaw proved the intent element, regardless of any purpose that

Anheuser may have had, since "it was foreseeable that this phone call could result in interference

with Wardlaw's employment relationship with Inland."  76 F.3d at 1376-78.

*Gianacopoulos v. MOS Design, Inc.*, 2008 WL 1774094 (M.D.Pa. April 16, 2008)

(No. CIV.A. 3:05-2417) confirmed that

> **Comment j** to § 766 states that the cause of action 'is broader ... in its application than
> to cases in which the defendant has acted with [the] purpose or desire" of interference
> with a contract.  The cause of action also includes intentional interference, as that term is
> defined in § 8A [FN5], in which the actor does not act for the purpose of interfering with the
> contract or desire it but knows that the interference is certain or substantially certain to
> occur as a result of his action. The rule applies, in other words, to an interference that is
> incidental to the actor's independent purpose and desire, but known to him to be a
> necessary consequence of his action. Restatement (Second) Torts § 766, **comment j.**

>> FN5. Section 8A defines "intent" for purposes of the Torts Restatement. It
>> provides that "[i]f the actor knows that the consequences are certain, or
>> substantially certain, to result from his act, and still goes ahead, he is treated by
>> the law as if he had in fact desired to produce the result."

2008 WL 1774094 at *5. *Maryland Jockey Club v. ODS Technologies, L.P.*, 2005 WL 1200181 (D.Md. May 20, 2005) (No. CIV. WMN-03-2124), in allowing an interference claim against a third party to proceed, held that it does not diminish proof of intent, under the substantially certain standard, that the interfering actor is mistaken about "'the legal significance of the facts which give rise to the contractual duty'" or "'that the contract means something other than what it is judicially held to mean'" so long as he knows the underlying facts. 2005 WL 1200181, *10.

The Department's Motion focuses on the predictability method of proving intent. It proved that it was certain or reasonably certain that Harnischfeger's actions would interfere with the severance contracts between Beloit and the former Beloit workers involved here. To establish intent under that predictability method, it did not need to show that Harnischfeger took those actions for the purpose, or prime purpose, of interfering. Applicable law did not require that the interferer have any prior or subsequent involvement with the contracting parties, that the interference be caused by a contracting party feeling directly threatened by the interferer, that the interferer benefit from the interference, or that the interferer be able to predict that the interference would cause any harm, much less predict the nature of the ultimate harm. It suffices that it was certain or reasonably certain that some interference would occur.

Harnischfeger knew that it was certain or reasonably certain that some interference would occur to the severance contracts even if the only act of interference was Dangremond telling Readinger that the Committee wanted Beloit to eliminate severance – and even if, contrary to the record evidence, the Committee had actually expressed to the Debtors that this is what it wanted. But the court's own Factual Findings require that the scope of interfering actions be expanded to the subsequent statement by Dangremond that the Committee had approved the alternative Readinger asked him to check on, since Dangremond had to know that this statement would

16

result in that alternative being implemented.  Considering the initial contact and this subsequent

contact, without any amendment to the Factual Findings, more than suffices to confirm that

Harnischfeger, through Dangremond, knew that it was certain or reasonably certain that some

interference would occur to the severance contracts.  As noted above, however, and in the

Motion, manifest errors of fact require amendments and additions to the Factual Findings.

Making those corrections would confirm that Harnischfeger was deeply involved, on an ongoing

basis, in interfering actions and that it intended to interfere because it was certain or substantially

certain that its ongoing actions would interfere with those contracts not only in some way –

which is all that was needed – but in the precise way that the interference ultimately occurred.

Proper corrections to the Factual Findings would also confirm that, contrary to what

Dangremond told Readinger, the Committee never expressed to the Debtors that it wanted the

severance contracts changed, was never told that they were being or had been changed, and most

certainly never "approved" those changes.  But that does not affect the intent inquiry.  No matter

to what level the court proceeds in the analysis, one thing is clear: it was a manifest error of law

to determine that the Department did not prove the intent element.

## V.      THE COURT SHOULD ALTER OR AMEND CONCLUSIONS ABOUT PROOF OF THE FINANCIAL INTEREST PRIVILEGE.

A party asserting privilege must demonstrate that its reasons for interference fell within

the scope of the privilege (*Wolf v. F & M Banks,* 193 Wis. 2d 439, 462, 534 N.W.2d 877, 885-86

(Ct.App. 1995)) and must, because it bears the burden of proving the privilege, present factual

evidence showing why it interfered (*Wolnak v. Cardiovascular & Thoracic Surgeons*, 2005 WI

App 217, ¶ 38, 287 Wis. 2d at 582, 706 N.W.2d at 679; *Hoey Outdoor Advertising, Inc. v. Ricci*,

2002 WI App 231, ¶¶ 26-28, 256 Wis. 2d 347, 361-62, 653 N.W.2d 763, 777; *Mendelson v. Blatz*

*Brewing Co.*, 9 Wis. 2d 487, 492, 101 N.W.2d 805, 807 (1960)).  *Culcal Stylco v. Vornado, Inc.*

(1972) 26 Cal.App.3d 879, 103 Cal.Rptr. 419 (1972), holding that a parent's interference with its

subsidiary's contract was not privileged, cautioned that it is "a state-of-mind privilege" turning on

the interferer's "predominant purpose in inducing the breach of the contract" and to be

"determined on the basis of proof rather than of pleading."  26 Cal.App.3d at 882-883.

The party must act to protect "its own ... financial stake" in the "breaching party's

business." *Vinas v. Chubb Corp.*, 499 F.Supp.2d 427, 431-32 (S.D.N.Y. 2007).  "[T]ortious

interference claims are subject to an 'economic interest defense' **if** the defendant 'acted to protect

its own legal or financial stake in the breaching party's Business.'"  *Kargo, Inc. v. Pegaso PCS,*

*S.A. de C.V.*, 2008 WL 2930546, *10 (S.D.N.Y. July 29, 2008) (No. 05CIV.10528(CSHDFE),

emphasis added.  It must be a "'financial interest in the business of the person induced.'" *Select*

*Creations, Inc. v. Paliafito America, Inc.*, 911 F.Supp. 1130, 1159 (E.D.Wis. 1995), quoting

Restatement (Second) of Torts, Second § 769.  The Opinion recognized this (D.I. 563, p. 38

(Restatement provides privilege defense for "financial interest in the business of the person

induced"), but required no such proof from Joy Global (D.I. 563, pp. 56-62).  Joy Global instead

presented evidence that its interfering actions did **not** further its own financial interests in Beloit.

The court, in determining that Joy Global proved its financial interest privilege defense,

relied on conclusions that Readinger and Winkleman – acting as Beloit officials in the fall of

1999 (FF 9 & 10) – may have taken actions to protect the interests of **Beloit**.  (D.I. 563,

pp. 60-61.)  This privilege analysis constituted a manifest error of law.  Beloit was a party to the

contracts and **its** financial interests are immaterial in determining whether Harnischfeger, by

interfering, was protecting Harnischfeger's financial interests.  The Factual Findings actually

point away from Dangremond acting to protect financial interests that Harnischfeger may have

18

had in Beloit.  (D.I. 565 (Post-Judgment Motion, ¶ 18).)  The court could cite no evidence

suggesting that Harnischfeger interfered to protect financial interests that Harnischfeger had in

Beloit (D.I. 563, pp. 60-61), although that was the critical inquiry on Joy Global's defense,

because there is no such evidence.  Evidence about Dangremond's motive or purpose in

interfering was unavailable because Joy Global failed to present any such evidence at trial, as

was its burden.  This failure of proof is clear whether interference is restricted to the initial

contact, expanded to encompass the statement by Harnischfeger to Beloit that the Committee had

approved the alternative plan, or expanded further to include all interfering actions.  If Joy Global

found it difficult to muster any such evidence for trial purposes – because Dangremond could not

recall his interference actions by December 2008 when he was deposed (D.I. 523, p. 18, n.1) – it

has only itself to blame.  (D,I. 565 (Post-Judgment Motion, ¶ 17).)

     Correcting manifest errors of fact would emphasize the manifest errors of law in

determining that Joy Global proved its financial interest privilege.  Harnischfeger's statements to

Beloit about what the Committee expressed were substantially different than what it actually

expressed; and its interfering actions were ongoing.  Correcting the Factual Findings to

accurately and completely reflect the relevant record evidence would confirm that Joy Global

could not conceivably have proven its financial privilege defense.

    VI.    THE COURT SHOULD ALTER OR AMEND ITS JUDGMENT, AFTER
             DETERMINING THE APPROPRIATE AMOUNT OF INCREASED
             WAGES, BY ENTERING JUDGMENT IN FAVOR OF THE
             DEPARTMENT AND AGAINST JOY GLOBAL, BASED ON THE
             DAMAGES ALREADY DETERMINED BY THE COURT TOGETHER
             WITH AN APPROPRIATE AMOUNT OF INCREASED WAGES.

    "A Rule 59 'motion to alter or amend judgment m[ay] rely on ... the need to correct clear

error [of law] or prevent manifest injustice.' [Citation omitted.]"  *Pediatrix Screening, Inc. v.*

*Telechem Intern., Inc.*, 602 F.3d 541, 546 (3rd Cir. 2010).  A court "has the power under Rules 52(b) and 59(e), read together, to alter or add to its conclusions of law where appropriate" (*U. S. Gypsum Co.*, 668 F.2d at 180) and the power to reverse the prior judgment (*id.*, 668 F.2d at 176-80)).  Unquestionably, if "'the trial court has entered an erroneous judgment it should correct it.'"  *National Metal Finishing Co., Inc.*, 899 F.2d at 123-24.

## CONCLUSION

For the foregoing reasons, the Department requests that the court grant the relief requested in the Motion and enter Judgment in favor of the Department and against Joy Global for the damages determined in the Opinion as well as an appropriate amount of increased wages.

Defendant, Wisconsin Department of
Workforce Development, by

/s/ Stuart B. Drowos                           J. B. Van Hollen, Attorney General
Stuart B. Drowos (DE Bar # 427)*               /s/ Richard Briles Moriarty
Deputy Attorney General                        Richard Briles Moriarty (WI Bar # 1017190)*
Division of Revenue                            Charlotte Gibson (WI Bar # 1103755)*
Delaware Department of Finance                 Assistant Attorneys General
Carvel State Building                          Wisconsin Department of Justice
820 N. French Street, 8th Floor                Post Office Box 7857
Wilmington, Delaware 19801                     Madison, Wisconsin 53707-7857
(302) 577-8660                                 (608) 267-2796 (Moriarty)
                                               (608) 266-7656 (Gibson)

*Counsel of Record